625 A.2d 314

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Marc H. SLIFFMAN.

Misc. Docket (Subtitle BV) No. 9, Sept. Term, 1991.

Court of Appeals of Maryland.

June 4, 1993.

Melvin Hirshman, Bar Counsel and Kendall R. Calhoun, Asst. Bar Counsel, for the Attorney Grievance Com'n of Maryland, for petitioner.

Durke G. Thompson, Wheaton, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

McAULIFFE, Judge.

The events giving rise to this attorney disciplinary action occurred in 1985 and 1986. At that time, the respondent, Marc H. Sliffman, was practicing law by himself in Montgomery County, Maryland. At least 50 percent of respondent's practice involved settlements of real estate transactions, and half of those cases were referred to him by General Mortgage Services (GMS), a mortgage broker.

An investigation by the Maryland Attorney General's office into GMS' business practices revealed that the company had qualified borrowers for loans by altering various pre-approval documents required by lenders, and had otherwise engaged in fraudulent practices. In October 1987, principals of GMS pled guilty to conspiracy to commit theft over $300. One of the convicted principals, Ellen Ballman, had referred a substantial number of GMS settlements to respondent.

The Attorney Grievance Commission conducted an investigation of respondent's handling of settlements involving

GMS, and in 1991 filed a Petition for Disciplinary Action, charging violation of a number of disciplinary rules of the Code of Professional Responsibility,[1] arising out of three settlements conducted by respondent. We transmitted the charges to Judge James L. Ryan for hearing. Judge Ryan filed a written statement of his findings of fact and conclusions of law. Bar Counsel and respondent have each filed exceptions to certain of those findings and conclusions, which we shall decide as we separately discuss the three settlements.

## I. The Panayappan Settlement

Mr. and Mrs. Ramanthan Panayappan (hereinafter Panayappan) contracted for the purchase of a newly constructed home and placed their existing home on the market, planning to finance the purchase of the new home in part with a loan and in part with the proceeds received from the sale of their existing home. When their existing home did not sell and the time for settlement on the new home drew near, Panayappan turned to GMS for assistance. The principals of GMS decided that Panayappan should refinance his existing home in order to obtain the cash needed to settle on the new home. GMS had apparently obtained a loan commitment from Numerica Financial Services, Inc. for the major portion of the purchase price, and proposed to handle the refinancing through ICA Mortgage Corporation.

Martha Kushner, who was the president of GMS, realized that in making loans of the size contemplated for the refinancing, lenders were reluctant to approve a transaction that resulted in the borrower receiving a large cash sum. Accordingly, she fraudulently "created" an existing encumbrance of $110,446; that is, she falsely reported to the lender the existence of a mortgage or deed of trust in that

---

1. The Code of Professional Responsibility governed the conduct of attorneys in this State until 1 January 1987, when the Maryland Rules of Professional Conduct became effective.

amount, and represented that the loan proceeds would in part be used to pay that encumbrance.

Bar Counsel contended that respondent was aware of and facilitated this fraudulent conduct. Respondent and Ms. Kushner denied that respondent had any knowledge of the scheme. Ms. Kushner testified that as the mortgage broker, she sent to respondent a package of material showing a bona fide transaction, and that she then altered the settlement sheets and created other documents in her dealings with the lender. Judge Ryan found "suspect" the action of respondent in returning the loan package to GMS instead of directly to the lender, but concluded there was no clear and convincing evidence that respondent knew the documents were going to be altered by GMS. Bar Counsel did not except to this finding.

There were additional problems with the Panayappan settlements. Settlement on the purchase of the new home began on 30 August 1985, prior to settlement on the refinancing. Although settlement was not completed on 30 August because Panayappan did not have the required funds, some of the required documents were signed and Panayappan was allowed to move into the new home. One of the documents executed on 30 August was a certification, signed by respondent, that settlement had been completed on that date. Bar Counsel contends that the existence of this document was a misrepresentation by respondent, in violation of DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation). Although Judge Ryan found that respondent had not forwarded the certificate to the lender, but had retained it in his files, he concluded that this constituted a misrepresentation because respondent knew his files were subject to periodic audits by title companies.

Respondent excepted to this finding, and we sustain the exception. There is not sufficient evidence of record to support a finding by clear and convincing evidence that respondent's retention in his own file of a certificate of

completion erroneously executed at the incomplete settlement of 30 August did, or was intended to, misrepresent a material fact to anyone.

Settlement of the purchase of the new home was put on hold, pending settlement of a refinancing. On 5 September, Panayappan appeared at respondent's office for settlement of the refinancing. At that point, with the figures available on both transactions, it became apparent that Panayappan would not have sufficient funds to settle on the purchase of the new home even after the refinancing was completed. According to respondent, Panayappan lacked approximately $32,000 after exhausting his personal funds.

On or about 21 September, respondent prepared an agreement and a promissory note for the signature of Panayappan. The note was in the amount of $32,000, with interest at the rate of $300 per month until paid. The name of the lender was left blank in each instrument. Respondent testified he hoped to find someone who would lend the money to Panayappan, but if he could not, he planned to act as the lender. Panayappan signed the note and agreement without knowing who the lender would be. Respondent acted as lender.

Although the note recited a principal indebtedness of $32,000, respondent advanced only about $8,300 [2] to complete the settlement. Respondent advanced this money from his attorney trust account, but contends that the funds represented earned fees that he had retained in that account, and thus was his money and not that of other clients. Respondent testified that he was able to settle Panayappan's transaction without a greater outlay of cash because: 1) part of what Panayappan owed represented fees and charges due to respondent, which he deferred by,

---

2. Judge Ryan found the amount of the loan to be $8,300. From exhibits in the file, it would appear that the total advanced by respondent, after payment of homeowner's association dues and a hazard insurance premium, was $9,118.55. The difference is not significant in the outcome of this proceeding.

in effect, lending that amount to Panayappan; and 2) respondent did not immediately pay off four unsecured loans owed by Panayappan, totaling $17,820.74, which the refinancing lender had required be paid as a condition of the loan. Respondent undertook, as the undisclosed party to the agreement with Panayappan, to be responsible for the payment of those loans "if required by ICA Mortgage Corporation ... or if in his sole and absolute discretion he believes that it is necessary to pay these amounts...." Panayappan agreed to, and did, make the required periodic payments on these unsecured loans. Panayappan ultimately paid these loans in full, so respondent did not advance any of his own funds in connection with them.

Nine months after Panayappan signed the $32,000 note, he arranged an equity loan and asked respondent for a payoff figure on his loan. Respondent advised Panayappan that $15,819.90 would be required to satisfy the loan, and Panayappan paid that amount. According to Panayappan, respondent did not provide any explanation or accounting of the advances or charges that made up this amount, nor did respondent tell Panayappan that respondent was the lender. According to respondent, the amount paid by Panayappan represented the initial advance made by respondent, interest on the loan, respondent's fees and charges, and attorney's fees for additional services in connection with the loan.

Judge Ryan concluded that respondent violated several disciplinary rules. First, he found that respondent violated DR 1–102(A)(4) by misrepresenting to ICA Mortgage Corporation that the four unsecured loans owed by Panayappan had been paid from the proceeds of the refinancing. Respondent does not except to this finding, and the record provides ample support for it. The lender's instructions were clear: settlement of the loan was conditioned on payoff of these specified loans. Respondent violated the lender's instructions by not paying those loans, and misrepresented to the lender that he had done so. Through the separate agreement with Panayappan, respondent kept an option to immediately pay those loans if he had to, but

because they were not recorded encumbrances and because Panayappan made the monthly payments, no one was the wiser and respondent apparently felt no obligation to pay them.

Judge Ryan also found that respondent violated DR 5-104(A) by entering into the loan agreement with Panayappan. DR 5-104(A) provided:

A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

Judge Ryan found:

The testimony was that when it became apparent Mr. Panayappan would not be able to come up with enough money to complete the purchase of his new home, Mr. Sliffman, without disclosing himself as the lender, loaned the sum of $8,300.00 to Mr. Panayappan from fees being maintained by him in his escrow account....

While it was Mr. Panayappan's testimony that he consented to the terms of repayment and was satisfied with the transaction, it is clear to the court that Mr. Sliffman's interests differed from his client's and that he did not disclose to Mr. Panayappan the circumstances of the transaction. The fact that Mr. Sliffman received $15,-819.90 from his client approximately nine months after making a loan of $8,300.00 is clear and convincing evidence of their differing interests.

Respondent excepted to this finding, contending that he did nothing more than assist a client who was desperate to settle. We overrule respondent's exception, finding the evidence sufficient to support the hearing judge's conclusion.

Judge Ryan may have been slightly inaccurate in his assessment of the principal amount loaned to Panayappan; as we indicated in note 2, above, the actual cash advance was probably $9,118.55, rather than $8,300. Additionally, it

appears that respondent "loaned" Panayappan an amount equal to the fees respondent was due from the settlements. This does not affect the validity of Judge's Ryan's finding. There was no "full disclosure" in this case. Indeed, as Judge Ryan found, respondent never disclosed to Panayappan that respondent was the lender. That respondent's interests in the loan transaction differed from those of his client is demonstrated by the fact that respondent charged his client 11.25 percent per annum interest on the principal sum of $32,000, although at the time he computed the interest respondent knew that nothing approaching that principal amount had ever been advanced. Moreover, in addition to the interest charges, respondent added some substantial but undisclosed "attorney's fees" for his efforts in connection with this loan.

The term "differing interests" within the meaning of DR 5-104 has been held to include "every interest that will adversely affect either the judgment or loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest." *Committee on Prof. Ethics, Etc. v. Mershon*, 316 N.W.2d 895, 988 (Iowa 1982). *See also Attorney Griev. Comm'n v. Baker*, 285 Md. 45, 48, 399 A.2d 1347 (1979) (court found "differing interests" where attorney, who was undisclosed stockholder in corporation needing money, arranged for client to loan money to corporation); *People v. Stineman*, 716 P.2d 1079, 1082 (Colo.1986) (by making a loan to a client, attorney entered into an agreement that would allow his professional judgment to be affected by his own financial interest, thereby violating DR 5-104); *In re Bishop*, 297 Or. 479, 686 P.2d 350, 354-55 (1984) ("differing interests" found where attorney co-signed loan for client, thereby putting them in potential debtor/creditor situation). We need not go as far as the holdings in those cases to find that respondent's conduct here violated DR 5-104.

The hearing judge further found that respondent, in violation of DR 9-102(A):

commingled his own funds with clients' funds in his escrow account and failed to keep an accurate account of what funds in the account were escrow funds and what funds were his fees.

DR 9–102 provided in pertinent part as follows:

(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

(1) Funds reasonably sufficient to pay bank charges may be deposited therein.

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

\*       \*       \*       \*       \*       \*

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

Respondent excepted to the hearing judge's finding of a violation of DR 9–102(A). Bar Counsel excepted to the failure of the hearing judge to also find a violation of DR 9–102(B), and to his failure to find that respondent violated Art. 10, § 44 of the Maryland Code (1957, 1987 Repl.Vol.), which also prohibited commingling of clients' and attorneys' funds. We grant Bar Counsel's exception in part, and overrule respondent's exception. We agree with Bar Counsel that the hearing judge's findings of fact necessarily included a finding that respondent violated § (B)(3) of DR

9–102. We also agree that the facts found by Judge Ryan demonstrate a violation of Art. 10, § 44. See *Attorney Griev. Comm'n v. Cockrell*, 304 Md. 379, 392, 499 A.2d 928 (1985). We do not believe, however, that a finding of a violation of Art. 10, § 44 would be other than duplicative of the finding that respondent violated DR 9–102(A).

In offering an explanation of his use of the attorney trust account funds to make the loan to Panayappan, respondent said he was certain he had sufficient earned fees in that account to cover the loan. He testified that in a number of cases he did not disburse fees to himself when he completed a settlement. He gave several reasons for this practice, including: preoccupation with other business; concern that if he had the money in his own account he would be more prone to spend it; and, his desire to maintain a "cushion" in the attorney trust account to avoid having a check returned for insufficient funds because of a clerical error or a bad check given him by someone else. As Judge Ryan found, "Respondent did not disburse fees to himself from his escrow account when they were earned, but allowed earned fees to remain in escrow for months."

The best that can be said for this portion of the transaction is that it represents a clear violation of DR 9–102. On its face, the transaction appears to be the use of other clients' funds. Respondent did not identify particular fees claimed to be due him when he drew on the attorney trust account; he did not draw checks from that account to his business account, but disbursed directly from the trust account; he made no entries in any books or records that would identify the transaction as a withdrawal of fees, or that would allow him or anyone else to identify which fees from which cases had been withdrawn. Respondent did not maintain a journal or ledger sheets for the attorney trust account that would enable him or anyone else to readily determine the status of any client's funds in that account. The attorney trust account could be analyzed only by resort to bank statements, cancelled checks, and a review of individual files. The investigator for the Attorney Griev-

ance Commission undertook such an analysis to determine whether respondent had sufficient earned fees in the account to cover the loan to Panayappan. The investigator was able to verify the presence of $5,700 of retained fees at the time the Panayappan checks were drawn.

■ Respondent testified that he had a good working knowledge of his files and was able to estimate the amount of fees retained in the trust account at any given time. He explained the difference between the $5,700 in fees verified by the investigator and the $8,300 (or more than $9,000) withdrawn by him for Panayappan by stating that a $5,000 retainer was also present in the trust account, against which he felt he could draw. The record does not disclose the nature of that retainer or the amount of work done after its receipt. Judge Ryan did not conclude from this testimony that respondent had converted clients' funds. He did, however, upon a firm foundation of facts, find that respondent had improperly commingled his funds with that of his clients,[3] and had failed to maintain adequate records concerning the attorney trust account.

■ Judge Ryan also found that respondent "engaged in dishonest conduct" when he waited until 1986 to disburse to himself from his attorney trust account fees earned in 1985. He found that respondent "maintained several thousand dollars in fees in the escrow account until January of 1986, failing to properly report them as income for federal and state income tax purposes in 1985." Respondent excepted to this finding, contending there is insufficient evidence of record to support a finding that he held earned fees in his trust account for some dishonest motive. It is true, as Bar Counsel pointed out, that ordinarily attorney's fees must be

---

3. We do not suggest that an attorney may not maintain a continuous balance in an attorney trust account sufficient to avoid bank charges. We are not required to address the propriety of an attorney maintaining an additional modest, constant balance as a guard against clerical errors. We can perceive of no serious objection to this practice, however, if the records clearly show what is being done and why, and the amount established as a "cushion" remains constant.

reported in the year in which earned, and a failure to transfer earned fees from an attorney trust account to an operating or personal account will not change this reporting requirement. *See Miele v. Commissioner*, 72 T.C. 284 (1979). A failure to timely transfer earned fees from a trust account, while it may involve impermissible commingling of funds, is not an inherently dishonest act with respect to the tax laws. In order to establish dishonesty, the evidence must show that respondent delayed the transfer of fees with the intent to evade tax reporting requirements. This record does not contain clear and convincing evidence of that intent. Respondent's exception to this finding is sustained.

## II. The Lackey Settlement

In July 1986, Kenneth and Mary Lackey contracted to purchase a home for $137,500, agreeing to pay $6,875 down and to obtain a loan in the amount of $130,625. GMS sought a loan of $133,250 on behalf of the Lackeys, and created and filed with the prospective lender a fictitious contract showing a sale price of $170,000 and a proposed loan of $133,250. Based on the fraudulent contract and other fraudulent documents created by GMS, Travellers Mortgage Services, Inc. (Travellers) agreed to make the loan.[4] GMS sent the settlement package to respondent, allegedly including only the bona fide contract. Respondent conducted settlement of the case based on the sale price of $137,500 and a loan of $133,250, and forwarded the settlement documents to GMS. GMS apparently altered the settlement documents to show the higher contract price, and forwarded the package to the lender.

At settlement, the Lackeys found they were $2,000 short of the cash required to close. Respondent apparently con-

---

4. For reasons not apparent in the record, the promissory note and deed of trust were made payable to GMS, and on the same date assigned by GMS to Travellers. Funds used at closing were provided by Travellers.

tacted GMS, and GMS agreed to loan the $2,000 to the Lackeys by deferring receipt of that much of the fee owed to GMS, and taking a promissory note for that amount. The settlement sheet prepared by respondent did not disclose this $2,000 loan, but rather showed "cash from borrower" of $13,057.33, of which the $2,000 was a part.

Bar Counsel made two contentions concerning the Lackey settlement: 1) that respondent knew of and participated in the fraud being perpetrated by GMS, and failed to rectify that fraud in a manner required by DR 7-102; and, 2) that respondent was guilty of misrepresentation in certifying that the purchasers had provided $2,000 in cash, when in fact they had not. The evidence disclosed that settlement instructions sent to respondent by GMS bore the incorrect sale price of $170,000. Respondent explained that he thought this was an error, and he simply crossed through that figure and inserted the correct figure of $137,500 shown by the contract sent to him. It should be noted that the loan application forwarded to respondent similarly showed a sale price of $170,000.

Bar Counsel also pointed to a "speed memo" found in respondent's file, which had been sent to respondent by Ellen Ballman, one of the principals of GMS, which read in part: "Attached please find both contracts as per our discussion of 10-8-86." Respondent denies receiving two different contracts from GMS, and points to a note to his secretary that he claims to have written on the bottom of the Ballman memo which stated: "Sue—call Ellen—ask what she is referring to—only 1 contract is here—are they [sic] amendments missing?" Bar Counsel also finds suspicious the fact that two second pages, but only one first page, of a sales contract dealing with the transaction were found in respondent's files. Ms. Kushner, president of GMS, testified that respondent did not know of the fraudulent documents. Judge Ryan was "not convinced by the evidence that Respondent was aware there were two separate sales contracts." Bar Counsel did not except to this finding, and we accept the finding of the hearing judge.

Judge Ryan did find, however, that respondent "misrepresented to the lender that the Lackeys had paid the cash required to complete the settlement on October 20, 1986 in the amount of $13,057.33," and respondent has excepted to that finding. Respondent argues that the Lackeys' obtaining the necessary $2,000 through a loan from GMS was no different than if they had obtained the money through the use of a credit card—that he would have no greater obligation to report the former loan than the latter. We are aware that lenders often protect themselves by requiring borrowers to certify at settlement that they have not undertaken additional obligations, but there is no evidence that respondent was asked to, or did, participate in the preparation and forwarding of any such documents. Had he done so, we would have had no hesitation in finding his participation to be a misrepresentation. We do not, however, view his preparation of the settlement sheet in this manner to constitute a misrepresentation, and we sustain respondent's exception to this finding.

### III. The Aumiller Settlement

In March, 1986 Joseph Aumiller contracted to buy a home from Seth and Joan Goldberg for $200,000, agreeing to obtain a first trust of $180,000. Aumiller applied for a loan through GMS. GMS again prepared a fraudulent contract, showing a sale price of $230,000 and a first trust of $207,-000, and with these documents obtained a loan commitment for $207,000. GMS forwarded the original contract to respondent for settlement, but in the instructions, GMS listed $230,000 as the sale price and $207,000 as the loan. Respondent claims he called GMS about the discrepancy, and was told to correct the contract price to $200,000, but that the loan amount was correct at $207,000.

Settlement took place under curious circumstances. The purchasers were kept in one room and the sellers in another. Respondent prepared separate settlement sheets for each party. Although respondent prepared the note and deed of trust for $207,000, he showed the financing on the

settlement sheet as two loans: $180,000, and $27,000 as "additional financing." GMS allegedly altered the settlement sheets to show the fraudulent sale price before sending the package to the lender. Again, the president of GMS testified that respondent had no knowledge of the false contract. Bar Counsel argued that respondent must have known of the alteration for a number of reasons. Judge Ryan concluded:

> The court finds Bar Counsel's argument concerning the Aumiller settlement sheet persuasive, and also finds that the manner in which the Aumiller settlement was conducted is suspect. However, the court does not believe there is clear and convincing evidence that Mr. Sliffman was directly involved in the alteration or fabrication of settlement documents or knew that documents were being altered or fabricated by GMS.

Bar Counsel did not except to this finding, and we accept the finding of Judge Ryan.

### IV. Sanction

The purpose of disciplinary proceedings is to protect the public rather than to punish the erring attorney, although concepts of general and specific deterrence are consistent with that primary goal. *Attorney Griev. Comm'n v. Owrutsky*, 322 Md. 334, 355, 587 A.2d 511 (1991). We have found that respondent has violated a number of disciplinary rules, involving misrepresentation, commingling of funds, inadequate records, and improper dealings with his clients. These multiple disciplinary violations, coupled with the fact that respondent previously received a reprimand on 2 October 1987 for neglect of an estate matter, warrant the imposition of a significant sanction. Marc H. Sliffman shall stand suspended from the practice of law for a period of one year, and thereafter until all costs are paid. This sanction shall take effect 30 days from the date this opinion is filed.

IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS

COURT, INCLUDING THE COSTS OF TRANSCRIPTS PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST MARC H. SLIFFMAN.