697 A.2d 446

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Frank A.K. AWUAH.**

**Misc. Docket (Subtitle BV) No. 54, Sept. Term, 1995.**

Court of Appeals of Maryland.

July 29, 1997.

Melvin Hirshman, Bar Counsel, and James P. Botluk, Assistant Bar Counsel, for the Attorney Grievance Commission of Maryland.

Thomas A. Farrington, Bowie, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

BELL, Chief Judge.

The Attorney Grievance Commission (the "Commission"), by Bar Counsel, filed, in this Court, a petition seeking disciplinary action against Frank A.K. Awuah, the respondent. The petition alleged multiple violations of the Maryland Rules of Professional Conduct. Specifically, the respondent was charged with violating Rules 1.5 [1]; 1.15 [2]; 4.1 [3]; and 8.4.[4]  In

---

1.  Rule 1.5 *Fees*

(a) A lawyer's fees shall be reasonable.  The factors to be considered in determining the reasonableness of the fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or layers performing the services;  and

(8) whether the fee is fixed or contingent.

* * * *

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law.  The terms of the contingent fee agreement shall state the method by which the fee is to be determined, including the percent or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses are to be deducted before or after the contingent fee is calculated.  Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

2.  Rule 1.15 *Safekeeping Property*

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate

addition, the Commission charged violations relating to the respondent's management of his attorney trust account, namely, of Maryland Code (1996) § 10–302 [5] and § 10–306 [6] of the

from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Subtitle BU of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or the third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or the third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or the third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

3. Rule 4.1 *Truthfulness in Statements to Others*

(a) In the course of representing a client a lawyer shall not knowingly;

(1) make a false statement of material fact or law to a third person; or

(2) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client.

(b) The duties stated in this Rule apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

4. Rule 8.4 *Misconduct*

It is professional misconduct for a lawyer to:
* * * *

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

5. § 10–302 *Attorney Trust Account.*

(a) Required.—Unless a lawyer or the firm of the lawyer maintains an attorney trust account in accordance with this subtitle and the Maryland Rules, the lawyer may not accept trust money.
* * * *

6. § 10–306 *Misuse of Trust Money.*

Business Occupations and Professions Article and of the rules pertaining thereto,[7] *i.e.*, BU3 [8]; BU6 [9]; BU7 [10]; and BU9.[11]

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

7. Effective January 1, 1997, these rules, numbered BU1—BU12, were renumbered and placed in Title 16, Chapter 600 of the Maryland Rules. Since the BU Rules were in effect when these proceedings occurred, all references in this opinion will be to them.

8. Rule BU3. *Duty to Maintain Account*

An attorney or the attorney's law firm shall maintain one or more attorney trust accounts for the deposit of funds received from any source for the intended benefit of clients or third persons. The account or accounts shall be maintained in this State, in the District of Columbia, or in a state contiguous to this State, and shall be with an approved financial institution. Unless an attorney maintains such an account, or is a member of or employed by a law firm that maintains such an account,. an attorney may not receive and accept funds as an attorney from any source intended in whole or in part for the benefit of a client or third person.

9. Rule BU6. *Name and Designation of Account*

An attorney or law firm shall maintain each attorney trust account with a title that includes the name of the attorney or law firm and that clearly designates the account as "Attorney Trust Account," "Attorney Escrow Account," or "Clients' Funds Account" on all checks and deposit slips. The title shall distinguish the account from any other fiduciary account that the attorney or law firm may maintain and from any personal or business account of the attorney or law firm.

10. Rule BU7. *Commingling of Funds*

a: General Prohibition

An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule BU4 or permitted to be so deposited by section b.

b: Exceptions

1. An attorney or law firm may deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, and any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney client.

2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

Pursuant to Maryland Rule BV9b [12], we referred the matter to the Honorable Michael D. Mason, of the Circuit Court for Montgomery County, for hearing and to make findings of fact and conclusions of law in accordance with Maryland Rule BV11a. Following the evidentiary hearing, Judge Mason concluded that the respondent did violate Professional Conduct Rule 8.4(b), those pertaining to his attorney trust account, as well as § 10–302. On the other hand, Judge Mason concluded that Bar Counsel failed to prove the other violations by clear and convincing evidence, noting, in the process, that the respondent's use of funds from a trust account for operating expenses was "motivated by ignorance of his obligations and not by fraud, dishonesty or deceit." Bar Counsel has excepted only to the hearing court's failure to find violations of Rules 1.15 and 8.4(c) as well as § 10–306.

I

Judge Mason made findings of fact as follows:

"The Respondent, Frank A.K. Awuah, was born in Ghana and attended high school and university there. He initially came to the United States to attend MIT, where he received a Bachelor of Science in Chemistry. After attending MIT, he went on to the University of Pennsylvania for one year. After leaving the University of Pennsylvania because no grant mon-

---

3. Funds of a client or beneficial owner, may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

11. Rule BU9. *Prohibited Transactions*

An Attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or bearer.

12. Effective January 1, 1997, the Rules pertaining to attorney discipline proceedings were renumbered. They are now codified as Chapter 700, Maryland Rules §§ 16–701 through 16–718. The references in this opinion will be to those in effect at the time of these proceedings, *i.e.*, the BV Rules 1 through 18.

ey was available, he went on to Georgia Tech where he ultimately graduated from law school in 1985. He was admitted to the practice of law in the summer of 1986 in the District of Columbia. The Respondent originally came to the District of Columbia hoping to find work with a public agency. Only after all efforts in that regard proved fruitless, did he turn, out of economic necessity, to the private practice of law. He had never before worked in such an office, had no experience in running such an office and, as later events demonstrate, was ill-prepared to undertake the running of such a business.

"He opened an office as a sole practitioner engaged in the general practice of law. At about the same time, he began operation of a business that provided some legal services called Immigration Counseling Services. Having been admitted to the practice of law in the District of Columbia, the Respondent applied for admission and was admitted to the practice of law in Maryland in 1990.

"The Respondent has acknowledged that upon admission to the Bar of Maryland, he failed to maintain a separate account as is required for the handling of client funds. Although he accepts that he is chargeable with such knowledge, he was unaware of the requirement to maintain such a separate account. Instead the Respondent used the Immigration Counseling Service account as a repository for client funds as well as fees that he earned in connection with some of his cases. By way of example, upon receiving fees in settlement of a case, he would deposit the entire sum into the Immigration Counseling Service account. After determining what monies were due to the client, he would disburse those monies. Thereafter, however, he would leave his own fees in the account. He would then use those fees, out of that account, to pay personal and operating expenses from time to time as needed. Except apparently for client settlement sheets, he kept no records of what money in the account represented fees that he had earned versus clients' monies. However, it is significant to note that there is no evidence that at any time since he began the practice of law in 1990 any client of his had lost any money as a result of this practice.

"It further appeared from the evidence that the Respondent was able at almost all times to maintain sufficient funds in the account to cover all checks drawn on the account. The only occasion where the account appeared to have been overdrawn was soon after a secretary had deposited monies that were supposed to have gone into the Immigration Counseling service account into a separate operating account that he maintained. The Court accepts that his secretary did deposit these funds into the wrong account by accident at a time when the Respondent was leaving the country for a trip to his homeland. Because monies that he assumed had been deposited to the Immigration Counseling Service account had been deposited in a separate account, there were three checks that he wrote that caused Immigration Counseling Service account to show a negative balance. However, apparently, the bank covered those checks. While it was somewhat surprising to the Court to hear that the Respondent didn't even recognize his secretary's error upon his return from his trip to Africa, he testified that he rarely bothered to look at the bank statements to attempt to reconcile the accounts. This testimony is corroborated by the fact that he did not discover until the hearing before the Inquiry Panel that many years ago, the bank had made a mistake by posting a deposit of approximately $11,000.00 as $1,000.00. This fact, that the bank owed the Respondent $10,000.00 went undiscovered for years. Finally, the Respondent testified that since the instituting of the investigation by Bar Counsel, he has substantially altered his record keeping as well as his banking practices and now does keep books for his accounts and does have a separate client trust account and does routinely review the accounts.

"The Court also heard testimony that in a particular instance involving a client, Cynthia Dinkins, the Respondent entered into a fee arrangement which purported on its face to charge a one-third contingency fee on PIP payments. The evidence showed that Cynthia Dinkins and her family, a total of four persons, were involved in an accident. The Respondent represented all four claimants. The insurance company settled all claims for a total sum of $9,500.00. However,

$2,265.00 of that sum represented PIP payments. The settlement balance sheet ... on its face evidences that the Respondent initially charged one-third of the gross settlement, including PIP payments, as his fee in this case. This would represent a $750.00 payment for handling PIP claims. However, the same exhibit further reflects that the Respondent rebated $500.00 of his fee. Accordingly, the document can be read as then evidencing that with respect to the PIP claims the Respondent charged a total fee of $225.00 to process all four claims. While there was a suggestion in a statement made by the Respondent before the Inquiry Panel, that he may have charged a one-third fee in other PIP cases at some time, the evidence was that this is no longer his practice and there was no other specific instance that the Court could find where such a fee was charged. The Court does not find in the Dinkins case that the fee actually charged was unreasonable in light of the number of PIP claims that were processed.

"Most of the evidence presented related to certain assignments and authorizations which had been provided by Mr. Michael Wheatley, who testified on behalf of Medical Home Care Equipment (MHCE), to the Respondent in the cases of nine of the Respondent's clients.... It was Mr. Wheatley's complaint regarding the Respondent's handling of these assignment[s] and authorizations which initially led to Bar Counsel's investigation resulting in the instant petition. The unrebutted evidence was that in at least three of the nine instances, those involving Binty Masary, Samba N'Daiyes, and Benedicta Ofori, there had been no settlement. Therefore, the existence of assignment and authorizations in those cases in no way reflected upon the Respondent's fitness to practice law. In each of the remaining instances, the evidence showed that, notwithstanding the existence of assignments and authorizations in the file, the Respondent had failed to disburse monies directly from his trust account to MHCE in the full amount of their bills. Regarding the remaining six cases, the Respondent offered the following explanations.

"A. *Toure Boubaker*

In this instance, the Respondent acknowledged that he had failed to pay the claim directly from the settlement proceeds. He explained that prior to the time of settlement he had discussed the claim with the client's PIP carrier. He was told by that insurance representative that it was a covered expense. They were auditing the expense. To the extent that they determined it to be fair and reasonable, it would be paid. Therefore, the Respondent, proceeding upon the assumption that PIP would pay the claim, disbursed the funds directly to the client, without withholding funds for MHCE. This explanation was unrebutted.

"B. *Cynthia Dinkins*

Here the Respondent testified that he was aware of the bill from MHCE at the time of settlement. When he discussed that bill with the client, she represented to him that she would take care of it. Upon her promise to do so, he disbursed the sums directly to her, including the sums due to MHCE. Again, this explanation was unrebutted.

"C. *Vivian High*

Again, in this instance, the Respondent acknowledged being aware of the fact that at the time of settlement, that MHCE had an outstanding claim in the amount of $1,396.00. Respondent further testified that when he discussed this charge with the client, the client told him that she had spoken with Mr. Wilson, a representative of MHCE, who had assured her that the bill would be discounted. The bill appeared to be quite high for the service offered. The client told the Respondent that she considered, in light of that conversation, the PIP payment of $2,000.00 to have discharged the claim. In response, the Respondent disbursed the remaining monies to the client without withholding the $1,396.00 claimed by MHCE.

"Testimony at the time of the hearing did confirm that MHCE had employed a marketing individual named Wilson who was no longer employed by the company. Mr. Wheatley

had testified that he was uncertain what Mr. Wilson might have agreed to, but that Mr. Wilson would not have been authorized to enter into any such discussions. Nevertheless, he did not deny that Mr. Wilson may have entered into such conversations. Again, this explanation of events was unrebutted by any evidence including any testimony from Ms. Vivian High.

"D.  *Alim Ibrahim*

According to the Respondent, this case involved a claim for Worker's Compensation. Discussing the claim with the insurance company, the Respondent was informed that the medical expenses would be paid directly by the insurance company. The Respondent further testified that at some point the adjuster told him that MHCE had compromised their bill. The adjuster indicated to the Respondent that he was sending the attorney a check for the balance. Accordingly, the Respondent thereafter disbursed those monies to the client without withholding monies for MHCE. Again, the Respondent's explanation was unrebutted.

"E. and F. *William Ahilable and Sammy Tachie*

In these two instances, the Respondent's handling of the assignments and authorizations was similar and more problematic. In both of these instances, the MHCE was asserting claims in excess of $3,000.00. According to the Respondent in each instance, he discussed these claims with the clients at the time of settlement. In both instances, the clients expressed surprise at the size of the claim. Each client separately upon learning of the amount of the claim told the Respondent that they would speak to Mr. Wilson, the representative from MHCE and get back to the Respondent. Thereafter the clients informed the Respondent that Mr. Wilson had agreed to accept $1,000.00 in each of their cases as full settlement of the claim. Accordingly, in both cases, the Respondent withheld $1,000.00 for payment of the claims asserted by MHCE. Thereafter, he maintained that he had contacted MHCE and advised them that he was forwarding to them, pursuant to Mr.

Wilson's agreement with the Respondent's client, the sum of $1,000.00 in both cases. MHCE responded that they would have to talk to Mr. Wilson and ultimately that the $1,000.00 was unacceptable. In both cases, the Respondent testified that he subsequently returned the money to the clients and informed the clients that he [sic] would then have to take care of these claims.

"The problem with the Respondent's explanation is there is little or no documentary evidence to support the Respondent's explanation. There was a settlement sheet for the Ahilable case ... which does not reflect that at the time of the settlement in January of 1992, $1,000.00 was withheld for payment to MHCE. There is no settlement sheet for the case of Sammy Tachie to provide similar corroboration. The Ahilable document does seem to provide some support for the Respondent's testimony that he believed MHCE had agreed to accept $1,000.00 and withheld that amount. However, the Court is troubled by the fact that the Respondent could offer no canceled checks evidencing the subsequent payment if $1,000.00 to each of the clients after learning that MHCE would not accept those monies in satisfaction of their claims. While the absence of such evidence causes the Court concern, in light of the absence of any other evidence to indicate that the Respondent at any time took a client's monies for his own use, as well as the character testimony presented by and on behalf of the Respondent, as well as the overwhelming conceded evidence with respect to the Respondent's total ineptness concerning the handling of the business aspects of his practice, the Court cannot say by clear and convincing evidence that the Respondent, after initially withholding the $1,000.00 for payment to MHCE, thereafter failed to return the monies to the clients."

II

From these factual findings, Judge Mason concluded, consistent with what the respondent has always conceded, that the respondent failed to maintain a trust account as required by Rule BU3 and, therefore, also failed properly to designate

such an account.[13]   Also consistent with the respondent's admission, he determined that the respondent "repeatedly commingled client funds with those of his own and that he failed to keep proper records regarding the handling of those monies."   And, the court acknowledged, the respondent on a single occasion directly transferred, *albeit,* accidentally, client trust funds into an operating account and on several occasions wrote checks to cash out of what he maintained as a trust account.   While indeed violations of Rule BU9, Judge Mason viewed them, and so concluded, as unintentional.   In a similar vein, noting his further finding that the respondent was ignorant of the obligation to refrain from commingling trust funds and his own and, in any event, "was not motivated to use client funds for his own benefit," Judge Mason opined that the Bar Counsel failed to produce "clear and convincing evidence that at any time [the respondent] intentionally used client funds for any purpose other than that to which they were intended."   Moreover, having determined that there were instances in which the respondent did not notify Mr. Wheatley, who, as the representative of MHCE, was a person who had an "interest" in the settlement proceeds of the clients who dealt with it, and that, in those instances, he "improperly shifted the notification responsibility to the client," the hearing court nevertheless attributed those lapses "to ignorance as opposed to any desire on the Respondent's part to cheat Mr. Wheatley out of any monies to which he may have been entitled."

Bar Counsel's submission that the respondent violated Rule 8.4 and § 10–306 of the Business Occupations and Professions Article was premised on the respondent having kept for his personal use the $1000.00 he withheld from the Tachie and Ahilable settlement proceeds.   Judge Mason found a lack of clear and convincing evidence that the respondent violated the statute.   With respect to the charged rule violation, he stated:

---

13.   At the hearing, Bar Counsel represented that "it is undisputed that Mr. Awuah maintained a trust account."   The issue here is whether this account is in accordance with the Maryland Rules.   Judge Mason points out that "the Respondent now does maintain a trust account, which has been properly designated."

The Court is not persuaded by clear and convincing evidence that the Defendant engaged in conduct involving dishonesty, fraud, deceit and misrepresentation. While the Respondent admittedly and clearly used funds from a trust account for operating expenses, it appears in this instance that such conduct was motivated by ignorance of his obligations and not by fraud, dishonesty or deceit. With respect to the Respondent's failures to pay Mr. Wheatley monies Mr. Wheatley claimed to be owed, the Court finds any failures to notify Mr. Wheatley were occasioned by the Respondent's ignorance of his obligation and not an attempt to defraud Mr. Wheatley of monies that he claimed. The Court has previously concluded that there is insufficient evidence to establish by clear and convincing evidence that the Respondent used for his own benefit the two $1000.00 payments that had been withheld from the settlement funds for Ahilable and Tachie even after MHCE refused to accept them.

As indicated, Bar Counsel's only exception was to the failure of the court to find that the respondent misappropriated the two $1000.00 payments. To support his exception, he relies on the failure of the respondent's trust account records to substantiate the respondent's assertion that, having been told by MHCE that the amount withheld was unacceptable as payment in full, those payments were returned to the clients. Bar Counsel decries the court's acceptance of the respondent's "bald claim that he returned the money to his clients when the records of the Respondent's trust account show that no such payments were ever made." [14]

Bar Counsel's exception is overruled. It questions a factual finding by the judge who not only heard, but also was able to observe the demeanor of the respondent, whose testimony he credited. Judge Mason articulated the basis for his

---

**14.** Although not as clear as it could be, it appears from the hearing court's findings and conclusions that it found violations of Rule 1.15(a) and (b), but not (c). As to the latter, the court stated that Bar Counsel conceded that subsection's inapplicability to the facts *sub judice.*

conclusion that Bar Counsel did not establish by clear and convincing evidence that respondent failed to return the money to the clients. He considered the character testimony presented by the respondent, the absence of other evidence to indicate that respondent on any other occasion took client monies for his own use, and the overwhelming conceded evidence with respect to respondent's total ineptness concerning the handling of the business aspects of his practice. It is well settled that, in disciplinary proceedings, the factual findings of the hearing judge will not be disturbed unless they are clearly erroneous. *Attorney Griev. Comm'n v. Kemp*, 303 Md. 664, 674, 496 A.2d 672, 677 (1985). *See also*, Maryland Rule 8-131. There simply is no basis for overturning Judge Mason's factual finding that the respondent did not misappropriate any of his clients' money.

## III

■ The only remaining issue is the proper sanction. The respondent suggests that it is a reprimand. Bar Counsel, on the other hand, argues that the respondent should be disbarred. In truth, Bar Counsel's argument presupposes that Bar Counsel's exception is sustained and thus that the respondent is found to have misappropriated client, or other, funds entrusted to him. *See, e.g., Attorney Griev. Comm'n v. White*, 328 Md. 412, 421, 614 A.2d 955, 960 (1992); *Attorney Griev. Comm'n v. Bakas*, 323 Md. 395, 404, 593 A.2d 1087, 1091–92 (1991) (citing *Attorney Griev. Comm'n v. Ezrin*, 312 Md. 603, 608–09, 541 A.2d 966, 969 (1988)) (misappropriation of client funds or funds entrusted to an attorney "is an act infected with deceit and dishonesty and will result in disbarment in the absence of compelling extenuating circumstances justifying the lesser sanction"); *Attorney Griev. Comm'n v. Burka*, 292 Md. 221, 225, 438 A.2d 514, 517 (1981) (it is the respondent who must demonstrate, by clear and convincing evidence, that extenuating circumstances exist).

■ In this case, the court specifically found that the respondent did not misappropriate funds entrusted to him.

Moreover, it found that the manner in which the respondent managed the Immigration Counseling Service account did not result in any loss to any of his clients. To be sure, every lawyer is deemed to know the Rules of Professional Conduct, and is charged with the knowledge that along with the duty to maintain adequate records, an attorney must maintain a separate trust account with a title that includes the name of the attorney or law firm and that clearly designates the account as "Attorney Trust Account" or the equivalent. Rule BU6. Claimed ignorance of ethical duties and bookkeeping requirements is not a defense in disciplinary proceedings. Although ignorance does not excuse a violation of disciplinary rules, a finding with respect to the intent with which a violation was committed is relevant on the issue of the appropriate sanction. This is consistent with the purpose of a disciplinary proceeding: to protect the public, as well as to promote general and specific deterrence. *Attorney Griev. Comm'n v. Sliffman,* 330 Md. 515, 529, 625 A.2d 314, 321 (1993); *Attorney Griev. Comm'n v. Berger,* 326 Md. 129, 131, 604 A.2d 58 (1992) (citing *Attorney Griev. Comm'n v. Owrutsky,* 322 Md. 334, 355, 587 A.2d 511, 521 (1991)). *See also, Attorney Griev. Comm'n v. Wyatt,* 323 Md. 36, 38, 591 A.2d 467, 468 (1991) ("Our purpose in imposing a disciplinary sanction is to protect the public, rather than punish the erring attorney"). The public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed. *Attorney Griev. Comm'n v. Glenn,* 341 Md. 448, 483, 671 A.2d 463, 480 (1996); *Attorney Griev. Comm'n v. Myers,* 333 Md. 440, 447, 635 A.2d 1315, 1318 (1994).

In this case, respondent's violations result from negligent rather than intentional misconduct. Furthermore, respondent has shown substantial mitigation. These factors, given the court's findings, which, as we have indicated, are supported by the record, and its satisfaction that the respondent has taken steps to, and, in fact now is, in compliance with the rules pertaining to the maintenance of trust accounts, militate against disbarment. We agree with the hearing court, the

most significant cause of this disciplinary proceeding is the respondent's total lack of any training relevant to the management of a law office and in particular as to how to manage the financial records.[15]  Therefore, we believe that the appropriate sanction is an indefinite suspension from the practice of law, with the right of the respondent to apply for reinstatement after the suspension has been in effect for 60 days.  The respondent's reinstatement shall be conditioned upon his payment of all costs in this matter, and upon the monitoring of the financial management of his office for a period of one year, unless sooner terminated upon the recommendation of Bar Counsel, by a monitor approved by Bar Counsel and by this Court.  The suspension shall be effective 30 days from the filing of this opinion.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV 15c, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST FRANK A.K. AWUAH.*

---

**15.**  Our concern about this increasing problem has prompted us to ask the Rules Committee to consider whether it is possible to address it, as we have done with respect to professionalism, by requiring new lawyers, as a condition to admission to the bar, to take a course in law office management, in which the subject of trust accounts, among others, would be addressed.  We understand that this is a matter about which the Maryland State Bar is also concerned.