802 A.2d 1014

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND,**

v.

**Robert A. DiCICCO.**

**Misc. AG No. 40, Sept. Term, 2000.**

Court of Appeals of Maryland.

July 18, 2002.

Melvin Hirshman, Bar Counsel for the Attorney Grievance Commission of Maryland.

David B. Irwin, Towson, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, J.

Pursuant to Maryland Rule 16–709(a),[1] Bar Counsel, on behalf of the Attorney Grievance Commission ("Petitioner"), and at the direction of the Review Board, filed a petition with this Court initiating disciplinary proceedings against Robert

---

1. The charges in this case were filed on 5 December 2000 and processed below prior to 1 July 2001; thus, we refer to the attorney grievance procedural rules and terminology in effect prior to that date.

A. DiCicco, Esquire ("Respondent"), a member of the Maryland Bar since November 1964. In the petition, Bar Counsel alleged violations of Maryland Rules of Professional Conduct ("MRPC") 1.15 (safekeeping property) and 8.4 (misconduct); Maryland Rules 16–607 (commingling of funds) and 16–609 (prohibited transactions); and Maryland Code (1989, 2000 Repl.Vol., 2001 Supp.), Business Occupations and Professions Article, § 10–306 (misuse of trust money).[2]

Petitioner's initial investigation of Respondent stemmed from two unrelated complaints initiated by Chiroplus of Fullerton, a medical provider, and P. Dianne Hite, a former client of Respondent. After an analysis of Respondent's trust account records for the period of 1997–1999, however, Petitioner alleged additional violations, unrelated to the complaints, based on Respondent's general trust account activity.

In accordance with Md. Rule 16–706(d),[3] an inquiry panel hearing was scheduled. Respondent, following the advice of his counsel, waived his right to a panel review after Respondent's counsel was unable to obtain a postponement in order to review documents and prepare a defense.

We referred the matter to Judge Robert E. Cahill of the Circuit Court for Baltimore County to conduct an evidentiary hearing and make findings of fact and conclusions of law in accordance with Md. Rules 16–709(b)[4] and

---

Maryland Rule 16–709(a), states that "[c]harges against an attorney shall be filed by the Bar Counsel acting at direction of the Review Board."

2.  Unless otherwise provided, all statutory references are to Maryland Code (1989, 2000 Repl.Vol., 2001 Supp.), Business Occupations and Professions Article, § 10–306.

3.  Maryland Rule 16–706(d) states, in pertinent part, that "[e]xcept as provided by these Rules, no action except dismissal of the complaint may be taken unless the attorney against whom the complaint has been made has been afforded an opportunity to examine and controvert the complaint and be represented by counsel."

4.  Maryland Rule 16–709(b) states that the "Court of Appeals by order may direct that the charges be transmitted to and heard in any court

16–711(a).[5]  Following a two-day evidentiary hearing, at which Respondent was present and represented by counsel, the hearing judge concluded, by clear and convincing evidence, that Respondent violated MRPC 1.15(a) & (c), MRPC 8.4(a), and Md. Rules 16–607(a) and 16–609.  The hearing judge further concluded that Respondent did not violate MRPC 1.15(b), MRPC 8.4(c), or § 10–306.  Petitioner, pursuant to Md. Rule 16–711(b)(2),[6] filed with this Court exceptions to the hearing judge's findings of fact and conclusion of law that Respondent did not violate MRPC 8.4(c), and recommended Respondent's disbarment as the appropriate sanction.  Respondent filed a reply to Petitioner's exceptions and recommendation for sanction, urging a short period of suspension as the appropriate sanction, but took no written exceptions of his own.

## I.

## A.

### *Background*

After filing a petition for disciplinary action with this Court, Petitioner also referred the matter of Respondent's alleged misconduct to the State's Attorney for Baltimore County for criminal investigation.  On 22 January 2001, Respondent, pursuant to Md. Rule 2–403,[7] requested a protective order to stay

---

and shall designate the judge or judges to hear the charges and the clerk responsible for maintaining the record in the proceeding."

**5.**  Maryland Rule 16–711(a) requires that "[a] written statement of the findings of facts and conclusions of law shall be filed in the record of the proceedings and copies sent to all parties."

**6.**  Maryland Rule 16–711(b)(2) states that "[w]ithin 15 days after the filing of the record in the Court of Appeals, the attorney or the Bar Counsel may file in the Court of Appeals exceptions to the findings and conclusions and may make recommendations respecting the disciplinary sanction to be imposed."

**7.**  Md. Rule 2–403 states, in pertinent part, that "[o]n motion of a party or of a person from whom discovery is sought, and for good cause shown, the court may enter any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."

temporarily the disciplinary proceedings until the conclusion of the criminal investigation. This motion was denied. On 28 March 2001, Petitioner deposed Respondent as part of its investigation. Respondent's counsel advised Respondent, in light of the pending criminal investigation, to decline to answer substantive questions, pursuant to the Fifth Amendment to the United States Constitution.[8] Respondent followed the advice of his counsel at the deposition.

At the start of the evidentiary hearing before the hearing judge on the petition for disciplinary action, counsel for Respondent again raised the Fifth Amendment issue. The parties came to an agreement, which the hearing judge summarized as follows:

> [Petitioner] had intended to call the Respondent as part of his case. He was informed by [Respondent's counsel], however, that he expected his client to follow his recommendation to exercise his right under the Fifth Amendment to decline to answer substantive questions. The Respondent proposed that he be permitted to do that in a pre-hearing deposition and, in return, waive his right to testify in his own defense. The Commission then would offer the deposition as evidence, without objection, thereby avoiding the Respondent having to testify in open court and risk further health problems.[9]

Petitioner presented the testimony of William M. Ramsey, its investigator assigned to this matter. Petitioner also offered the testimony of John DeBone, a paralegal in Bar Counsel's office who, after subpoenaing and reviewing Respondent's bank records, conducted a computerized analysis of

---

**8.** The Fifth Amendment to the United States Constitution states, in pertinent part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."

**9.** At the evidentiary hearing, Respondent submitted into evidence a letter, dated 26 March 2001, indicating a psychiatrist's diagnosis as follows: "Mr. DiCicco has Major Depression. He is also complaining of intermittent chest pain and other physical symptoms. He is currently significantly symptomatic."

those records for the period 1 January 1997 through 23 February 2000. Consistent with the aforementioned "agreement," Petitioner also introduced, as its Exhibit No. 2, a transcript of Respondent's pre-hearing deposition. Respondent's sole witness was Henry A. Grandizio, C.P.A., who reviewed and commented on Mr. DeBone's analysis of the trust account records.[10]

### B.

### *Evidence Produced at the Hearing*

#### i. *The Chiroplus Complaint*

The Chiroplus complaint arose from Respondent's representation of Brian Gerhold in a negligence suit stemming from a traffic accident. Gerhold received medical treatment from Chiroplus for injuries sustained in the accident. Gerhold subsequently discontinued his treatment with Chiroplus due to a dispute over insurance coverage. In 1997, Gerhold's negligence claim settled for $7,000. The settlement proceeds were deposited into Respondent's escrow account. In accordance with Gerhold's instructions, Respondent paid the client's outstanding medical bills from the escrow account, with the exception of the Chiroplus bill for $4,326, which was disputed by the client. The dispute between Chiroplus and Gerhold eventually settled in 1999 for $3,500, at which time Respondent paid Chiroplus that amount from his escrow account. Chiroplus complained to Petitioner about the Respondent's alleged failure to make prompt payment to it following settlement of Gerhold's negligence claim.

The hearing judge summarized Mr. DeBone's analysis of Respondent's trust account regarding the Chiroplus complaint as follows:

[O]n April 2, 1997[,] a $7,000 settlement draft from State Farm Insurance Company was deposited in the escrow

---

**10.** The hearing judge noted that Mr. Grandizio did not prepare a report based upon his own analysis of Respondent's trust account records.

account on behalf of Brian Gerhold. Two years later, on May 4, 1999, check number 2794 for $3,500 was sent to Chiroplus. On numerous occasions during that two-year period, the trust account balance fell below not only the $4,326 claimed by Chiroplus but also the $3,500 ultimately disbursed to Chiroplus. Petitioner's Exhibit 6 is a copy of the bank statement for June, 1997. It reflects a balance on June 30, 1997 of $239.01. Mr. DeBone testified that on every day between August 6 and August 25, 1997 the balance was below the $3,500 paid to Chiroplus as well as the $4,326 it had been claiming for the services to Mr. Gerhold.

Based on Investigator Ramsey's testimony regarding his interview with Mr. Gerhold, the hearing judge noted that Mr. Gerhold expressed "satisf[action] with the representation of the Respondent even though he didn't receive any proceeds from the settlement after the medical bills were paid and the Respondent settled the Chiroplus claim for $3,500."

### ii. The Hite Complaint

Ms. Hite engaged Respondent to represent her in a personal injury claim arising from a traffic accident in 1997. Ms. Hite filed a complaint with Petitioner in November 1999 alleging difficulty in obtaining the proceeds of the October 1999 settlement of her claim. The hearing judge summarized Investigator Ramsey's testimony regarding the Hite complaint as follows:

[Ms. Hite] filed her complaint on November, 10, 1999, apparently alleging that after her personal injury claim was settled by the Respondent he had not responded to her numerous calls requesting disbursement of the net proceeds. The Respondent told Mr. Ramsey that he had disbursed the proceeds to Ms. Hite in November, 1999. On cross-examination, Mr. Ramsey acknowledged that it was "his understanding" that Ms. Hite was paid "within weeks of making the complaint".

Respondent's Exhibit 9 is a copy of his December 1, 1999 letter to [Petitioner] detailing the facts concerning his representation of Ms. Hite and enclosing copies of her Settlement Disbursement Record and his letter transmitting it to her on November 5, 1999–two weeks after she had endorsed the settlement draft. She approved the Disbursement Record by signing and returning it to the Respondent on November 13, 1999. She received the net proceeds on November 15, 1999–five days after she filed her alleged complaint.

### iii. Miscellaneous Trust Account Discrepancies

Recounting Mr. DeBone's testimony regarding further discrepancies revealed during his review of Respondent's trust account records, Judge Cahill noted the following:

[F]or client William Schlmalzer there was a deposit on January 9, 1997 of $7,500. The client was paid the sum of $4,599 on March 17, 1997. Between January 9th and March 17th the balance in Respondent's trust account fell below [$4,599] on nine occasions.

[O]n June 9, 1998 (sic.1997) an insurance check for $9,500 was deposited on behalf of Delores Melchoir and on July 25, 1997 she negotiated a check for her share of $6,103.67. On ten days between those two dates the balance in the account was below $6,103.67.

[S]imilar deficiencies [were found] in Respondent's trust account with respect to client Rae Spaugh, Dianne Kinzer, Catherine Hall, Brenda Rimgus, Samantha Fuller, John and Dorris Requardt, Dawn Smith, Ruth Beitler and several others. [Mr. DeBone] also noted that the lowest positive balance in the account was $3.55 on July 24, 1998, followed by negative balances of $3,098.64 on September 15, 1998, $782.64 on September 21, 1998 and $482.64 on October 6, 1998.

With respect to client Patrick DeBorde there were disbursements from the account totaling $27,872.49 between June 16, 1997 and May 11, 1999, but no deposits attributable

to Mr. DeBorde. Additionally, on July 7, 1999, there was a $16,999.90 deposit, followed by a disbursement to the Respondent of $23,000 the next day. Mr. DeBone did not understand these transactions.

Moreover, the hearing judge recounted that Mr. DeBone also testified that there were disbursements from Respondent's trust account that appeared to be unrelated to any of Respondent's clients, including checks written to the Maryland Unemployment Insurance Fund, Maryland Comptroller of the Treasury, Internal Revenue Service, Ford Motor Company, Baltimore Gas & Electric, the Clients' Security Trust Fund of Maryland, Cooks Fuel, Rosedale Federal, and the Baltimore County Bar Association.

Respondent argued that Mr. DeBone's analysis of the trust account was flawed in three respects. First, Respondent argued that the analysis failed to recognize the connection between a Mr. Ben Cadwalader and DiCicco's client Patrick DeBorde. As a result, the analysis incorrectly assigned transactions to an account for Mr. Cadwalader when in fact these transactions applied to the DeBorde account. Next, Respondent claimed that a transaction appearing as a $14,703.14 debit in Mr. DeBone's analysis was in actuality an unauthorized electronic check. Finally, Respondent argued that Mr. DeBone's analysis failed to take into consideration that the bank erroneously failed to credit Respondent's trust account with a $10,000 deposit in 1997.

Regarding the DeBorde matter, Judge Cahill summarized the cross-examination of Mr. DeBone as follows:

Mr. DeBone's analysis included a client account under the name Ben Cadwalader. That account, ID Code No. 127, reflected a deposit of approximately $67,000, deductions for payments to Baltimore County and a substantial positive balance, as to which there is no record of a further payment. Mr. DeBone conceded that, if the transactions he attributed to Cadwalader, in fact, related to DeBorde (I.D.Code 131), that would impact on his conclusion that the DeBorde account was out of trust.

Commenting on Respondent's evidence concerning this matter, the hearing judge noted:

Respondent's Exhibit 10, which allegedly consists of copies of some of the records produced at Respondent's deposition, shows that the $67,000 that Mr. DeBone had credited to the Cadwalader account had been disbursed by Cadwalader to the Respondent as Trustee for Patrick DeBorde. Other documents in the exhibit are various accountings made by the Respondent to [the Circuit Court] for trust monies he had received since the trust was established in 1985. A true test copy of the Petition and Order of the Circuit Court reflects that the trust was dissolved and the proceeds distributed to the beneficiary, who certified that the accounting was true, accurate and accepted by him.

Regarding the factual dispute whether Mr. DeBone's analysis with regard to a debit of $14,703.14 was actually an unauthorized electronic check as alleged by Respondent, the hearing judge observed:

Mr. DeBone was questioned about another item in his analysis-a debit of $14,703.14 in June, 1997. The bank statement lists that item as check number 2695. However, Resp. Ex. No.4 shows that it is not an escrow check; it is an electronically generated check, bearing number 2695 and dated June 26, 1997. It also bears the Respondent's printed name but shows an address other than his law office. It is payable to Baltimore Gas & Electric and signed electronically by Baltimore Gas & Electric "as authority signatory for Robert DiCicco".

The next-to-last page of Respondent's Exhibit 4A contains an undated, handwritten notation initialed by the Respondent stating: "This check out of sequence and not issued. I called bank and they said it was 'electronic' check to BGE. I never authorized such a check. Bank said they would return money to account. Please follow up. RAD." The Respondent offered no other documents relating to this transaction.

Finally, as to Respondent's assertion that Mr. DeBone's analysis neglected to recognize that the bank erred by failing to credit DiCicco's trust account with a $10,000 deposit in 1997 and, therefore, had the alleged deposit of $10,000 been properly credited, the account would not have been out of trust, Judge Cahill explained:

> On cross-examination, Mr. DeBone was shown Respondent's Exhibit 2A, alleged to have been part of the bank records produced by Respondent at the March 28, 2001 deposition, showing that $10,000 was deposited in the trust account on January 3, 1997. The second item of the Exhibit is an undated "Deposit Correction Notice" issued by the bank to advise the Respondent that an error was found regarding the deposit and that the error was corrected by crediting the account for $10,000. Mr. DeBone said that these two documents were not amongst the subpoenaed bank records he got from the bank in February, 2000 and furthermore: "That $10,000 would have no bearing on what we went over this morning [during my direct]."

Judge Cahill noted Mr.Grandizio's testimony regarding this matter:

> Mr. Grandizio reviewed Mr. DeBone's analysis, and the bank records and exhibits relating to the apparent failure to credit the account to reflect the $10,000 deposit, and the BG & E electronic withdrawal. In his opinion, had the missing $10,000 deposit been credited to the account, it would not have been out of trust. However, he conceded he made no inquiries of bank personnel about the missing $10,000 credit and did not prepare a report or analysis in support of his conclusion.

## C.

### Findings of Facts and Conclusions of Law

Based on the evidence presented, the hearing judge made the following findings of fact and conclusions of law:

### i.   The Chiroplus Complaint

The hearing judge found that, although Respondent failed to deliver funds to Chiroplus until two years after the settlement of Gerhold's negligence claim, he did so at the instruction of his client.   The hearing judge further noted that the dispute with Chiroplus was settled ultimately for an amount less than the face value claimed by Chiroplus.   Nonetheless, the hearing judge determined that Respondent did not keep the disputed funds separate and because, on numerous occasions in 1997, the balance of the escrow account fell below the $3,500 Respondent ultimately paid to Chiroplus in 1999, the account had been out of trust.   Accordingly, Judge Cahill concluded that Respondent violated MRPC 1.15(c), discussed *infra* at 674–76.

### ii.   The Hite Complaint

The hearing judge determined that Ms. Hite's allegation that the Respondent ignored her inquiries about her settlement proceeds was "completely discredited by the Respondent's letters to her before and immediately after she lodged her complaint."   The hearing judge thus concluded that "[t]he Commission failed to prove any ethical or statutory violations by the Respondent in his handling of the settlement of Mrs. Hite's personal injury claim."

### iii.   Violation of MRPC 1.15

**Rule 1.15.   Safekeeping property.**

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded.   Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

The hearing judge concluded that Respondent violated MRPC 1.15(a) by failing to hold property of clients or third persons separate from his own. Relying on the evidence presented by Petitioner, and further supported by adverse inferences drawn from Respondent's refusal to answer certain questions at his deposition,[11] Judge Cahill determined that

---

11. Citing *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."), *Whitaker v. Prince George's County*, 307 Md. 368, 514 A.2d 4 (1986), and *Kramer v. Levitt*, 79 Md.App. 575, 558 A.2d 760 (1989), the hearing judge concluded that adverse inferences should be drawn from Respondent's Fifth Amendment refusal to answer certain substantive questions at the pre-hearing deposition.

Although Respondent argued to the hearing judge in his post-hearing proposed findings of fact and conclusions of law that no adverse inferences could be drawn from his refusal to testify, Respondent ultimately did not take exception to the hearing judge's findings of fact or conclusions of law. Nor did Respondent contest at oral argument before this Court the hearing judge's treatment of adverse inferences. Therefore, we shall not address this point substantively here. In any event, had Respondent pursued such a challenge, it would not have affected the outcome. The adverse inferences drawn by the hearing judge from certain of Respondent's refusals to respond to questions, on

Respondent, on occasion, "used [the escrow account] as if it also served as his personal bank account."

With regard to Petitioner's allegation that Respondent failed to disburse prompt payment to Chiroplus, the hearing judge concluded that "[d]ue to the absence of any testimony from a representative of Chiroplus, the evidence [was] not clear and convincing that the Respondent violated Md. Rule of Professional Conduct 1.[1]5(b)."

As previously suggested, Judge Cahill found by clear and convincing evidence that, in regard to the Chiroplus matter, Respondent violated MRPC 1.15(c) by failing to keep the disputed funds separate until the matter between Gerhold and Chiroplus was resolved. The hearing judge noted, however, that the violation was "mitigated by the fact that Chiroplus voluntarily settled its claim not long after contacting Bar Counsel."

### iv. Violation of MRPC 8.4

**Rule 8.4. Misconduct.**

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

. . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . .

With regard to Respondent's violation of MRPC 8.4(a), the hearing judge concluded that "[i]t necessarily follows from the aforegoing conclusions that paragraph (a) of this Rule has been violated." The hearing judge concluded that Respondent did not violate MRPC 8.4(c), rejecting Petitioner's argument

the record before us, were either merely supplementary to Petitioner's affirmative evidence (or inferences drawable therefrom) regarding the relevant violations (as in the case of MRPC 1.15(a)) or so amorphous as not to be particularly probative of whether a violation occurred, i.e., were not unduly prejudicial to Respondent (*see infra* at 677–78).

that "multiple invasions of client funds can only be deemed to be intentional conduct." (Emphasis omitted). The hearing judge noted that other factors should be considered when determining whether an attorney violated MRPC 8.4(c). Specifically, Judge Cahill considered that Respondent had not been charged with violating MRPC 8.1(b). The hearing judge explained his consideration of this factor:

> [O]ther factors should be considered in deciding if proven violations of the several rules or the statute relating to escrow accounts rise to the level of dishonest, fraudulent and deceitful misconduct. Of importance, for example, is whether the attorney also was found to have violated Rule 8.1(b) by failing to cooperate with Bar Counsel during the investigation.... Bar Counsel elicited testimony from his witnesses about the Respondent not answering certain questions and not providing records, but I make no finding based upon that conduct since the Commission chose not to charge him with a Rule 8.1(b) violation.

Judge Cahill also noted that "[t]here is no evidence that a client sustained an actual loss." The hearing judge further commented that "[w]hile [actual financial loss] is not a necessary element of the commingling violations, it does have relevance to the charge that the Respondent's conduct involved dishonesty."

In addition, the hearing judge addressed the issue of adverse inferences with regard to Respondent's violation of MRPC 8.4(c). Regarding Respondent's refusal to answer a specific question at his deposition, Judge Cahill explained:

> Bar Counsel did ask the Respondent the following question at the conclusion of his deposition, knowing that the privilege would be claimed:
>
> Q. Okay. When you were interviewed by Mr. Ramsey who is here today and Mr. DeBone, you promised to provide explanation for the problems in your trust account. Do you recall them making that request of you?

[A. Same answer.[12]]

The adverse inference I draw, as fact-finder, from his lawful refusal to respond to this question is that he could not "explain" why he knowingly commingled personal and escrow funds so as to cause his escrow account to be frequently out of trust. I do not infer that his answer would have been that it was because he knowingly and willfully misappropriated client funds. Bar Counsel could have, but did not, put that very question to him. In fact, virtually every unanswered question during the deposition asked for an explanation-not an admission, making the permissible adverse inference difficult to conceptualize.

The Respondent properly gave up his right to testify as to whether his conduct was willful when he claimed his Fifth Amendment privilege. However, he did not waive the requirement that the Petitioner prove by clear and convincing evidence, that the implied misappropriation of client trust funds was consciously and deliberately done for an unlawful purpose.

The hearing judge summarized his conclusion of law regarding Petitioner's charge that Respondent violated MRPC 8.4(c) as follows:

In conclusion, unless the length of time that the commingling persisted, coupled with the frequency of the account being out of trust, is deemed to be sufficient proof that the Respondent willfully misappropriated trust funds, I would find that the Commission's evidence does not prove that he violated Rule 8.4(c).

### v. Violation of Md. Rule 16–607

**Rule 16–607.  Commingling of funds.**

a. **General prohibition.** An attorney or law firm may deposit in an attorney trust account only those funds re-

---

**12.** At Petitioner's deposition of Respondent, the parties agreed that Respondent could say "same answer" to indicate the following: "On advice of counsel, I respectfully decline to answer that question based upon my Fifth Amendment privilege."

quired to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

b. **Exceptions.** 1. An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 16–610 b 1(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.

2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

3. Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

Judge Cahill explained that "[t]he same clear and convincing evidence that proved the Respondent violated Rule 1.15(a) requires me to also find that he violated the general prohibition against commingling in paragraph (a) of [Md. Rule 16–607]."

*vi.  Violation of Md. Rule 16–609*

**Rule 16–609.  Prohibited transactions.**

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or

use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

The hearing judge concluded that "[t]he general prohibition against using escrow funds 'for any unauthorized purpose' would encompass using escrow funds to pay personal obligations. Therefore, the uncontraverted evidence of commingling necessarily proves the escrow funds, at times, were being used for that unauthorized purpose, thereby also violating [Md. Rule 16–609]."

*vii.  § 10–306*

### § 10–306.  Misuse of trust money.

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

In concluding that Respondent did not violate § 10–306, the hearing judge noted that Petitioner failed to prove that Respondent intended to misappropriate funds. In this regard, Judge Cahill explained:

[T]he Commission's evidence does not clearly and convincingly establish that the Respondent willfully intended to commit this quasi-crime. The length of time the account was out of trust, standing alone, does not establish the Respondent's general intent to misappropriate the funds of clients or third persons-particularly when it is reasonable to infer, based upon the lack of evidence, that not a single client sustained a monetary loss.

The only exceptions to the hearing judge's report that are before us are those taken by Petitioner.

## II.

It is well established that "[t]his Court has original jurisdiction over all attorney disciplinary proceedings." *Attorney Grievance Comm'n v. Dunietz,* 368 Md. 419, 427, 795 A.2d 706, 710–11 (2002) (citing *Attorney Grievance Comm'n v. Snyder,* 368 Md. 242, 253, 793 A.2d 515, 521 (2002); *Attorney Griev-*

*ance Comm'n v. Harris,* 366 Md. 376, 388, 784 A.2d 516, 523 (2001); Md. Rule 16–709(b) (stating that "[c]harges against an attorney shall be filed on behalf of the [Attorney Grievance] Commission in the Court of Appeals")). Furthermore, "[a]s the Court of original and complete jurisdiction for attorney disciplinary proceedings in Maryland, we conduct an independent review of the record." *Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 97, 797 A.2d 757, 763 (2002) (quoting *Snyder,* 368 Md. at 253, 793 A.2d at 521 (citing *Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 392, 692 A.2d 465, 469 (1997))).

In our review of the record, "[t]he hearing judge's findings of fact will be accepted unless we determine that they are clearly erroneous." *Id.* (quoting *Snyder,* 368 Md. at 253, 793 A.2d at 521 (citations omitted)). *See also Dunietz,* 368 Md. at 427–28, 795 A.2d at 711 ("The hearing judge's findings of fact are *'prima facia* [sic] correct and will not be disturbed unless clearly erroneous.'") (quoting *Attorney Grievance Comm'n v. Zdravkovich,* 362 Md. 1, 21, 762 A.2d 950, 960–61 (2000)); *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 388, 794 A.2d 92, 100 (2002) ("Factual findings of the hearing judge will not be disturbed if they are based on clear and convincing evidence."). Clear and convincing evidence "must be more than a mere preponderance but not beyond a reasonable doubt." *Harris,* 366 Md. at 389, 784 A.2d at 523– 24 (quoting *Attorney Grievance Comm'n v. Mooney,* 359 Md. 56, 79, 753 A.2d 17, 29 (2000)). We recently explained in *Dunietz* that "[a]s to the hearing judge's conclusions of law, 'our consideration is essentially *de novo.*'" *Dunietz,* 368 Md. at 428, 795 A.2d at 711 (quoting *Attorney Grievance Comm'n v. Thompson,* 367 Md. 315, 322, 786 A.2d 763, 768 (2001) (quoting *Attorney Grievance Comm'n v. Briscoe,* 357 Md. 554, 562, 745 A.2d 1037, 1041 (2000))).

### III.

Upon a review of the record, we shall overrule Petitioner's exceptions and affirm the hearing judge's findings of facts and conclusions of law.

A.

*Petitioner's Exceptions to Findings of Fact*

Petitioner took two exceptions to the hearing judge's findings of fact. First, Petitioner excepted to Judge Cahill's treatment of Mr. Grandizio's testimony that Respondent's escrow account would not have been out of trust if the bank had properly credited the account when Respondent allegedly deposited $10,000 in 1997. Additionally, Petitioner excepted to the hearing judge's finding that none of Respondent's clients incurred financial loss resulting from Respondent's misconduct.

With regard to the alleged $10,000 deposit error attributed to the bank, Petitioner argues that the evidence did not indicate indisputably the existence of such an error. Moreover, Petitioner argues that "even if one accepts the Respondent's evidence of an uncredited deposit of $10,000.00 on January 3, 1997, the Respondent was still out of trust on several occasions." While Petitioner claims that this $10,000 dispute has "muddied the evidence demonstrating that Respondent has misused funds," the hearing judge did not make a discrete finding as to the alleged $10,000 deposit. Moreover, the hearing judge determined, in accord with Petitioner's allegations, that Respondent's escrow account was out of trust, finding a violation of MRPC 1.15(a). Furthermore, the conclusion that Respondent did not violate MRPC 8.4(c), to which Petitioner excepts, does not turn on the disputed "finding of fact" as to the $10,000 deposit. A violation of MRPC 8.4(c) requires evidence that Respondent "engage[d] in conduct involving dishonesty, fraud, deceit or misrepresentation." Even absent credit being given to the evidence of a $10,000 bank error, Petitioner did not present sufficient evidence that Respondent's misconduct was dishonest, fraudulent, or deceitful. While a $10,000 bank error may affect whether the account was out of trust at a certain time, the number of times the account is out of trust, standing alone, does not compel finding a violation of MRPC 8.4(c) if other evidence supports a finding that the misconduct is the result of negligence, as opposed to

fraud or dishonesty. *See Attorney Grievance Comm'n v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997); *Attorney Grievance Comm'n v. Powell,* 328 Md. 276, 614 A.2d 102 (1992); *Attorney Grievance Comm'n v. Kramer,* 325 Md. 39, 599 A.2d 100 (1991). *See infra* at page 680.

Regarding the hearing judge's finding that none of Respondent's clients incurred monetary loss, Petitioner argues that Gerhold suffered a loss when the funds disputed by Gerhold and Chiroplus were not held separately by Respondent. This Court has recognized, however, that failing to hold funds separately does not cause necessarily actual economic loss to clients. *See Attorney Grievance Comm'n v. Goldberg,* 292 Md. 650, 441 A.2d 338 (1982). In *Goldberg,* as a result of the attorney's failure to supervise properly his employee, client funds were not held separately and the attorney's escrow account was out of trust. This Court determined, however, that there was "no actual loss to [the respondent's] clients by virtue of the negative balances in his escrow account." *Goldberg,* 292 Md. at 657, 441 A.2d at 342. *But see Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 489, 671 A.2d 463, 483 (1996) (noting that while "neither client suffered actual financial loss" as a result of the respondent's misappropriation of funds, the risk of loss involved is significant because "failure to keep client funds separate subjects the funds to the claims of creditors of the lawyer"). We hold, therefore, on this record that Respondent's failure to hold the disputed funds separately, although probative of risk of loss, does not, in and of itself, compel a finding of actual financial loss to clients. Furthermore, none of Respondent's clients, including Gerhold, claimed economic loss or sought compensation or reimbursement from Respondent. Accordingly, there is no clear and convincing evidence suggesting that any of Respondent's clients suffered actual financial loss because of Respondent's misconduct.

Moreover, "[t]he hearing judge is in the best position to evaluate the credibility of the witnesses and to decide which one to believe and, as we have said, to pick and choose which

evidence to rely upon." *Monfried,* 368 Md. at 390, 794 A.2d at 101. *See also Attorney Grievance Comm'n v. Sheridan,* 357 Md. 1, 17, 741 A.2d 1143, 1152 ((1999) (stating that the hearing judge is "in the best position to assess first hand a witness's credibility."); *Attorney Grievance Comm'n v. Kemp,* 303 Md. 664, 675, 496 A.2d 672, 677 (1985)). Thus, if Judge Cahill gave more weight to Mr. Grandizio's testimony than to Mr. De-Bone's testimony regarding these disputed factual matters, such weighing is within his discretion.

The findings of fact excepted to are based on clear and convincing evidence and are not clearly erroneous; thus, we will not disturb them. *See Garfield,* 369 Md. at 96–97, 797 A.2d at 763–64; *Dunietz,* 368 Md. at 427–28, 795 A.2d at 711; *Monfried,* 368 Md. at 388, 794 A.2d at 100. We therefore overrule Petitioner's exceptions to the hearing judge's findings of fact.

## B.

### *Petitioner's Exceptions to Conclusions of Law*

■ Petitioner excepts to the hearing judge's conclusion that Respondent did not violate MRPC 8.4(c) by "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation." Petitioner argues that "[t]he Commission's evidence of the multiple times the Respondent['s trust account] was out of trust demonstrates that the Respondent knowingly and recklessly operated his trust account." Petitioner asserts that this satisfies "the willfulness requirement to sustain a violation of Rule 8.4(c)." We reject this argument and hold that while the evidence presented shows that Respondent was negligent, Petitioner failed to prove that Respondent's misconduct was willful or deceitful. It is well settled that this Court will not find a violation of MRPC 8.4(c) when the attorney's misconduct is the product of "negligent rather than intentional misconduct." *Awuah,* 346 Md. at 435, 697 A.2d at 454. *See also Powell,* 328 Md. at 292, 614 A.2d at 110; *Kramer,* 325 Md. at 47, 599 A.2d at 104.

In *Awuah,* this Court determined that the respondent commingled client funds with his own funds on numerous occasions. We concluded that the attorney did not violate MRPC 8.4(c), however, because the attorney's misconduct was "motivated by ignorance of his obligations and not by fraud, dishonesty or deceit." *Awuah,* 346 Md. at 433, 697 A.2d at 453. We further noted that the respondent did not misappropriate funds entrusted to him and that his misconduct did not result in actual financial loss to any of his clients.

In *Powell,* 328 Md. at 292, 614 A.2d at 110, the Court concluded that the respondent, who unintentionally misappropriated client funds, did not violate MRPC 8.4(c) because "there was no clear and convincing evidence of 'dishonesty, fraud, deceit, or misrepresentation' on the part of [the respondent] in dealings with his client." Similarly, in *Kramer,* we did not find a violation of the former Maryland Code of Professional Responsibility DR 1–102(A)(4) [13] where the respondent engaged in misconduct with regard to his escrow account because the evidence presented did not show that the respondent "intentionally deceived or defrauded" his client. *Kramer,* 325 Md. at 47, 599 A.2d at 104. In *Kramer,* the lack of clear and convincing evidence of "deceit or misappropriation" was noted specifically. *Kramer,* 325 Md. at 46, 599 A.2d at 104.

While the evidence presented supports Judge Cahill's finding of negligence or sloppiness, there is no clear and convincing evidence on this record to support a finding of dishonesty, fraud, deceit, or misrepresentation on Respondent's part. We further note the lack of clear and convincing evidence of misappropriation or actual financial loss to any of Respondent's clients. We therefore overrule Petitioner's exception to the hearing judge's conclusion that Respondent did not violate MRPC 8.4(c).

---

13. The predecessor to MRPC 8.4 was Maryland Code of Professional Responsibility DR 102(A) which stated, in pertinent part, as follows: "A lawyer shall not: ... (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

IV.

■ Confirming the violations of MRPC 1.15(a) & (c), MRPC 8.4(a), and Md. Rules 16–607(a) and 16–609 found by the hearing judge, we turn now to the appropriate sanction. Petitioner, citing *Attorney Grievance Comm'n v. Bernstein,* 363 Md. 208, 768 A.2d 607 (2001), recommends that Respondent be disbarred because "misappropriation of funds by an attorney warrants disbarment absent compelling extenuating circumstances." Respondent, on the other hand, urges that "a short period of suspension is appropriate."

■ It is well established that

[t]he purpose of disciplinary proceedings is to protect the public rather than to punish the erring attorney. The public interest is served when this Court imposes a sanction which demonstrates to members of this legal profession the type of conduct that will not be tolerated. By imposing such a sanction, this Court fulfills its responsibility to insist upon the maintenance of the integrity of the Bar and to prevent the transgression of an individual lawyer from bringing its image into disrepute. Therefore, the public interest is served when sanctions designed to effect general and specific deterrence are imposed on an attorney who violates the disciplinary rules.

*Garfield,* 369 Md. at 98, 797 A.2d at 764 (quoting *Dunietz,* 368 Md. at 428–29, 795 A.2d at 711 (internal quotations omitted) (citations omitted)). In considering the appropriate sanction in an attorney disciplinary action, this Court usually considers the following factors, among others:

'[A]bsence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation;

imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.'

*Dunietz,* 368 Md. at 430, 795 A.2d at 711 (quoting *Attorney Grievance Comm'n v. Jaseb,* 364 Md. 464, 481–82, 773 A.2d 516, 526 (2001) (quoting *Glenn,* 341 Md. at 488–89, 671 A.2d at 483)).

We recognize that "misappropriation of client funds or funds entrusted to an attorney 'is an act infected with deceit and dishonesty and will result in disbarment in the absence of compelling extenuating circumstances justifying the lesser sanction.'" *Awuah,* 346 Md. at 434, 697 A.2d at 454 (quoting *Attorney Grievance Comm'n v. Bakas,* 323 Md. 395, 403, 593 A.2d 1087, 1091 (1991)). Where there is no finding of intentional misappropriation, however, and where the misconduct did not result in financial loss to any of the respondent's clients, an indefinite suspension ordinarily is the appropriate sanction. *Id.* In this regard we have stated:

> Although ignorance does not excuse a violation of disciplinary rules, a finding with respect to the intent with which a violation was committed is relevant on the issue of the appropriate sanction. This is consistent with the purpose of a disciplinary proceeding: to protect the public, as well as to promote general and specific deterrence.

*Awuah,* 346 Md. at 435, 697 A.2d at 454. *See also Attorney Grievance Comm'n v. Jeter,* 365 Md. 279, 293, 778 A.2d 390, 398 (2001) (issuing an indefinite suspension where "the respondent did not intend to defraud"); *Attorney Grievance Comm'n v. Adams,* 349 Md. 86, 98–99, 706 A.2d 1080, 1086 (1998) (holding that a 30–day suspension is appropriate where the respondent did not intentionally misuse client funds).

In *Jeter,* the respondent was found to have violated MRPC 1.15 (safekeeping property) and § 10–306 (misuse of trust money) by failing to keep client funds in a separate escrow account and by failing to pay a client's physical therapist until six months after receiving the client funds to do so. Considering that "the respondent did not intend to defraud," we ordered an indefinite suspension rather than disbarment. *Jet-*

*er,* 365 Md. at 293, 778 A.2d at 398. *See also Attorney Grievance Comm'n v. Drew,* 341 Md. 139, 154, 669 A.2d 1344, 1351 (1996) (holding that failure to safe keep property in the attorney's escrow fund, absent clear and convincing evidence to support intentional misappropriation, warranted suspension as opposed to disbarment).

Considering all of the circumstances in this case, we conclude that the appropriate sanction to be imposed in this matter is an indefinite suspension from the practice of law with the right to seek reinstatement after 90 days. The suspension shall take effect 30 days from the date of the filing of the opinion. In doing so, we consider the absence of fraudulent intent and the lack of evidence that any client suffered financial loss resulting from Respondent's misconduct. We further note the lack of evidence of any prior disciplinary problems in Respondent's nearly 38 year membership before this Bar.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT; INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST ROBERT A. DICICCO; RESPONDENT'S SUSPENSION SHALL COMMENCE THIRTY DAYS FROM THE FILING OF THIS OPINION.*