831 A.2d 1042

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Diane E. CAFFERTY.

Misc. AG No. 82, Sept. Term, 2002.

Court of Appeals of Maryland.

Sept. 8, 2003.

Melvin Hirshman, Bar Counsel and Dolores O. Ridgell, Assistant Bar Counsel for the Attorney Grievance Commission of Maryland, for petitioner.

Tracy E. Mulligan, Jr., Esquire, Rockville, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

## I.

### A.

Diane E. Cafferty ("Respondent") was admitted to the Maryland Bar on 19 December 1985 and the District of Columbia Bar in October 1986. On 3 July 2002, Respondent was disbarred in the District of Columbia by Order of the District of Columbia Court of Appeals. *In re Glenn H. Carlson & Diane E. Cafferty*, 802 A.2d 341 (D.C.2002).

The Attorney Grievance Commission of Maryland, acting through Bar Counsel, filed with this Court a petition for reciprocal disciplinary action against Respondent. Bar Counsel attached to its petition a certified copy of the District of

Columbia Court of Appeals's opinion in support of Bar Counsel's allegation that, because of Respondent's disbarment from the practice of law in the District of Columbia for engaging in conduct involving misappropriation and failure to render accountings promptly to clients upon request, Respondent should be disbarred also in Maryland. Based on the District of Columbia order disbarring Respondent, Bar Counsel alleges, under Maryland Rule 16–773,[1] violations of the Maryland Rules of Professional Conduct ("MRPC"), including MRPC 1.15(a),1.15(b), and 1.15(c),[2] 8.4(c) and

1. Rule 16–773 provides in relevant part:

(a) Duty of attorney. An attorney who in another jurisdiction (1) is disbarred, suspended, or otherwise disciplined, (2) resigns from the bar while disciplinary or remedial action is threatened or pending in that jurisdiction, or (3) is placed on inactive status based on incapacity shall inform Bar Counsel promptly of the discipline, resignation, or inactive status.

(b) Duty of Bar Counsel. Upon receiving information from any source that in another jurisdiction an attorney has been disciplined or placed on inactive status based on incapacity, Bar Counsel shall obtain a certified copy of the disciplinary or remedial order and file it with a Petition for Disciplinary or Remedial Action in the Court of Appeals pursuant to a Rule 16–751, and shall serve copies of the petition and order upon the attorney in accordance with Rule 16–753.

. . . .

(e) Exceptional Circumstances. Reciprocal discipline shall not be ordered if Bar counsel or the attorney demonstrates by clear and convincing evidence that:

(1) the procedure was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process;

(2) there was such infirmity of proof establishing the misconduct as to give rise to a clear conviction that the Court, consistent with its duty, cannot accept as final the determination of misconduct;

(3) the imposition of corresponding discipline would result in grave injustice;

(4) the conduct established does not constitute misconduct in this State or it warrants substantially different discipline in this State; or

(5) the reason for inactive status no longer exists.

2. Maryland Rule of Professional Conduct ("MRPC") 1.15 (Safekeeping Property) mandates:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Mary-

8.4(d),[3] and Md. Rule 16–609.[4] Bar Counsel asks this Court to impose corresponding discipline to that imposed by the District of Columbia. This Court ordered that Respondent show cause why she should not be disbarred in Maryland. Respondent filed a response, and we heard argument in this matter on 5 June 2003.

As a preliminary matter, we observe that Md. Rule 16–773(g) addresses the conclusive effect of a prior disciplinary adjudication as follows:

Except as provided in subsections (e)(1) and (e)(2) of this Rule, a final adjudication in a disciplinary or remedial proceeding by another court, agency, or tribunal that an attorney has been guilty of professional misconduct or is

---

land Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

**3.** MRPC 8.4 (Misconduct) provides, in pertinent part, that it is professional misconduct for a lawyer to "(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;" or "(d) engage in conduct that is prejudicial to the administration of justice."

**4.** Rule 16–609 (Prohibited Transactions) states:
An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

incapacitated is conclusive evidence of that misconduct or incapacity in any proceeding under this Chapter. The introduction of such evidence does not preclude the Commission or Bar Counsel from introducing additional evidence or preclude the attorney from introducing evidence otherwise showing cause why no discipline or lesser discipline should be imposed.

We therefore accept the District of Columbia Court of Appeals's conclusion that Respondent recklessly misappropriated client funds and failed to render accountings promptly to her condominium clients upon request.

### B.

On 30 December 1997, District of Columbia Bar Counsel filed a specification of charges against Respondent alleging that she violated D.C. Rules of Professional Conduct 1.15(a), 1.15(b), 8.4(b), and 8.4(c). D.C. Bar Counsel filed identical charges against Respondent's law partner, Glenn H. Carlson, and moved to consolidate both cases because they arose out of the Carlson & Cafferty law firm's representation of owners of condominium units located at 1927 17th Street, N.W., in the District of Columbia. Respondent objected to the proposed consolidation claiming that consolidation would "taint" her due to Mr. Carlson's individual conduct in these matters and his failure to cooperate with D.C. Bar Counsel. The D.C. Board on Professional Responsibility determined that Respondent would not be prejudiced by the consolidation and that consolidation was appropriate. Four days of testimony were received in 1998 and, approximately two years later, the D.C. Hearing Committee issued its Report, which the D.C. Board on Professional Responsibility reviewed and modified.

The District of Columbia Court of Appeals summarized the factual record as follows:

"Documents in the record and the Board's Report reveal that in February 1985, during the last year of her law school studies, Ms. Cafferty worked as a law clerk at the firm of Kenny, Carlson & Warren. After her graduation from law

school and admission to the Maryland Bar, Ms. Cafferty joined the firm as an associate; she worked almost exclusively for Mr. Carlson. Around 1988, Mr. Carlson, Ms. Cafferty and Mr. Daniel Ferris left Kenny, Carlson & Warren and established their own firm, Carlson, Cafferty & Ferris. Mr. Ferris managed the firm's client trust fund. The firm became Carlson & Cafferty after Mr. Ferris's departure to practice law in another jurisdiction, and Mr. Carlson assumed the position of managing partner.

"The firm maintained a client trust fund at the Riggs Bank ("the Riggs Escrow Account"), an operating account at the First Liberty National Bank between March 1992 and September 1995, and an account for Commercial Quest, Inc. at Riggs Bank, which was used as an operating account beginning around September 1995. Ms. Cafferty served as President of Commercial Quest, 'a separate business venture.' Both Mr. Carlson and Ms. Cafferty had signatory authority on all of the firm's accounts. Ms. Hammond handled day-to-day management of the Riggs Escrow Account until she left the firm in 1993. The Board found that Ms. Cafferty 'regularly transferred moneys between the Riggs Escrow Account and the various accounts maintained by the law firm, generally at the direction of [Mr.] Carlson.'

"Around May 1989, Thomas Fritz, owner of a condominium unit at the 17th Street condominium, contacted Ms. Cafferty and asked her to represent him in his dispute with his condominium association over services and repairs at the condominium complex. She agreed, and Mr. Fritz decided to send his monthly condominium fee payments of $148.33 to Carlson & Cafferty. These payments were made from around May 1989, through March 1996, and were sent with a letter addressed either to Ms. Cafferty, or to Mr. Carlson and Ms. Cafferty. Each transmittal specified that the check should be put into the law firm's escrow account. Commencing in early 1990, at least two other residents of the 17th Street condominium sent monies to the law firm; these funds also were earmarked for the firm's escrow account.

Other persons connected to the 17th Street condominium transmitted funds to the firm for the escrow account.

"In addition to making payments for the law firm's escrow account, Mr. Fritz and two other owners of condominium units in the 17th Street condominium retained Carlson & Cafferty under a contingency fee arrangement, in March 1991, to take legal action against the principal officer of the 17th Street condominium's management company. Approximately ten months after the lawsuit was filed, the parties entered into a settlement agreement, and the settlement funds were placed in the Riggs Escrow Account.

"After settlement, Carlson & Cafferty continued to represent Mr. Fritz and other residents of the 17th Street condominium. In May 1992, Mr. Fritz and others retained the firm, at the hourly billing rate of $225, to 'prepare and update all condominium documents and to take steps necessary to have the [condominium association] in full compliance with the law and all governing documents.' Furthermore, when one of the persons whom the firm represented assumed responsibility for the management of the 17th Street condominium, bills of the condominium were sent to the firm for payment from escrow funds; some monthly condominium fees also were transmitted for deposit in the firm's escrow account.

"After retaining the firm in May 1992, the 17th Street condominium clients began to request billing statements, bylaws, and information about services that the firm had rendered. Responses to oral and written requests made between May 1992 and December 1994 were delayed. One accounting was received in October 1993, and at a February 1994 condominium association meeting, attended by Ms. Cafferty and Mr. Carlson, amended bylaws were submitted, as well as an accounting for funds received and paid on behalf of the association since 1989. The accounting showed that '[Carlson & Cafferty] had received over $60,000[,] ... had expended approximately $40,000, including $11,948.86 paid to the firm in fees and expenses' and $21,000 remained in escrow. Following the February 1994 meeting, Mr. Fritz

repeatedly asked the firm for additional accountings. An accounting was submitted in June 1995, and thereafter, no requested accounting was forthcoming until July 1997. By that time, two of the condominium clients had filed an ethical complaint against Mr. Carlson and Ms. Cafferty.

"Around February and April of 1994, the Washington Federal Savings Bank, which had foreclosed on three of the 17th Street condominium units, began paying monthly condominium fees on these units to Carlson & Cafferty for deposit into the firm's escrow account. When the 17th Street condominium was sold around March 1996, Washington Federal Savings Bank asked Mr. Carlson to disburse the funds held in the Riggs Escrow Account. Mr. Carlson sent a letter to Washington Federal Savings Bank on March 25, 1996, agreeing to disburse funds, except for $3,000 to be retained for potential liabilities. After the sale closed, Mr. Fritz and others repeatedly requested disbursement of the Riggs Escrow Account funds. Mr. Carlson did not honor these requests in a timely manner, undoubtedly because there were insufficient funds in the escrow account. In fact, the Board found that:

> By the Summer of 1996, when Carlson & Cafferty were required to disburse to the condominium owners the more than $40,000 that they had received to hold in trust, only approximately $2,000 of the funds remained in the Riggs Escrow Account. The missing funds of the [condominium association] had been used by [Mr. Carlson and Ms. Cafferty], without their clients' knowledge or consent, to pay themselves and other payees unrelated to the [condominium association], at times when the balance in the Riggs Escrow Account had fallen below the amount that [Mr. Carlson and Ms. Cafferty] were required to hold in trust for the [condominium association].

"The reason for the shortage of funds in the escrow account is that beginning around April 1992, and continuing to around September 1995, Mr. Carlson and Ms. Cafferty commingled the Riggs Escrow Account funds with other accounts and used the escrow funds for purposes not associ-

ated with the affairs of the condominium clients or the condominium association. During the 1992 to 1995 period, 'numerous checks' that Mr. Carlson and Ms. Cafferty wrote on their First Liberty National Bank operating account were dishonored due to insufficient funds. The Board found that bank records for the operating account 'reflected only three monthly periods in which the account was not overdrawn.' The Board also determined that: '[Mr.] Carlson and [Ms.] Cafferty regularly wrote checks using funds from the Riggs Escrow Account to pay firm expenses at times they both knew that the law firm had a shortage of funds in its operating account at First Liberty Bank.'

"After the bank closed Carlson & Cafferty's operating account, Mr. Carlson and Ms. Cafferty 'transferred thousands of dollars in funds from the Riggs Escrow Account to the Commercial Quest account,' and began to use that account as its operating account. Between September 1995, and December 1995, $35,425.30 was deposited into the Commercial Quest account, and less than $1,000 of that sum was traceable to a source other than the Riggs Escrow Account. During the September to December 1995 period, Mr. Carlson did not spend much time in Carlson & Cafferty's office and did not attend to the affairs of the law firm. Consequently, '[Ms.] Cafferty signed many of the checks that were drawn on the Riggs Escrow Account that transferred these funds' to the Commercial Quest account.

"Even before the close of Carlson & Cafferty's First Liberty National Bank operating account, Mr. Carlson and Ms. Cafferty were using funds from the Riggs Escrow Account to pay themselves and office expenses. Bank records revealed that this practice began around November 1991 and continued through 1996, and into 1997. Indeed, some 94 checks signed by Ms. Cafferty in 1995 alone, were written on the Riggs Escrow Account and were made payable to 'cash' in sums ranging from $50.00 to $7,615.06. Funds from one 'cash' check for $678.00 were used to pay a Carlson & Cafferty employee's rent.

"Funds deposited in the Commercial Quest account, which included monies transferred from the Riggs Escrow Account, also were used by Mr. Carlson and Ms. Cafferty for cash purposes. During the period September to December 1995, Ms. Cafferty wrote checks to cash on the Commercial Quest account which totaled $3,294.15.

"When she testified before hearing committee Number Five, Ms. Cafferty was asked about the checks made out to 'cash' that she wrote on the Riggs Escrow Account. She replied:

> Well, ... [Mr.] Carlson told me to take the cash out of the account; that he had plenty of money in the account ... If the operating account were low, he'd say take the money out of that and put the cash in the operating account so that it gets credited immediately.

She denied taking any of the condominium clients' funds, 'to [her] knowledge.' Instead, she maintained that funds for the checks made out to cash came out of Mr. Carlson's father's estate money. She thought that Mr. Carlson 'had an abundance of money.' She also asserted that at the time, Mr. Carlson had obtained about $39,000 from his wife to put into the account.

"Ms. Cafferty acknowledged during her testimony before the hearing committee that one of the reasons Mr. Carlson, Mr. Ferris and she left their prior firm was because an attorney in that firm sought to use money from a client trust account to pay office expenses. She admitted knowing 'that [such use] was wrong at the time[.]' She also confirmed that she had personally deposited some of the condominium clients' money into the firm's client escrow account periodically. When Bar Counsel inquired whether she paid herself 'compensation out of the [client] trust account,' she responded:

> Yes. When [Mr. Carlson] had his money in there, and I needed to get paid, he would say write it for cash, and he was loaning it to the firm from his money.

She added that she 'always thought that there were trusts within trusts that were theoretically insulated from each other.'

"By June 1997, Carlson & Cafferty still had not presented a final accounting to the condominium clients, and had not disbursed the condominium association funds that were supposed to be in the Riggs Escrow Account. Therefore, two of the condominium clients filed an ethical complaint against Carlson & Cafferty. Mr. Carlson informed Ms. Cafferty of the shortage of funds in the Riggs Escrow Account, but stated that he would obtain $39,000 from his wife to replace the funds. He put the funds from his wife, as well as smaller sums, into an account that he had opened in July 1997 at the First Liberty National Bank, to bring the Liberty account up to $40,624.39. Then he deposited $40,536.05 of that amount in the Riggs Escrow Account, and paid that sum to the condominium clients and the Washington Federal Savings Bank."

802 A.2d at 343–47 (internal footnotes omitted).

The District of Columbia Court of Appeals considered the report and recommendation of the D.C. Board on Professional Responsibility under a standard of review requiring the court to "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and [to] adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." 802 A.2d at 347 (quoting D.C.Bar. R. XI, § 9(g)). The court, however, also observed that its review of whether Ms. Cafferty recklessly misappropriated client funds was a legal question which it reviewed *de novo*.

The District of Columbia court noted that the definition of "misappropriation" in D.C. was "any unauthorized use of client's funds entrusted to [the lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not [she] derives any personal gain or benefit therefrom." 802 A.2d at 347–48 (quoting *In re*

*Harrison,* 461 A.2d 1034, 1036 (D.C.1983)). The court noted further that "misappropriation occurs whenever the balance in [the attorney's escrow] account falls below the amount due to the client" and is "essentially a *per se* offense." 802 A.2d at 348. Because of the serious nature of a misappropriation offense, the District of Columbia "adhered to a standard of presumptive disbarment," except in cases of negligent misappropriation or extraordinary circumstances. 802 A.2d at 348. The District of Columbia classifies misappropriation cases into three categories: (1) intentional misappropriation; (2) reckless misappropriation; and (3) negligent misappropriation. The principle of presumptive disbarment applies only to the first two categories. *Id.*

In the District of Columbia, Ms. Cafferty argued that if the facts of her case fell into any of the categories it was the negligent misappropriation category, and merited therefore only a six month suspension. *Id.* The D.C. Board, however, found her actions to constitute reckless misappropriation, meriting disbarment. *Id.*

> In that regard, the District of Columbia court opined that:
> The central issue in determining whether a misappropriation is reckless is *how* the attorney handles entrusted funds, whether in a way that suggests the unauthorized use was inadvertent or the result of simple negligence, or in a way that reveals either an intent to treat the funds as the attorney's own or a conscious indifference to the consequences of his [or her] behavior for the security of the funds.

*Id.* (quoting *In re Anderson,* 778 A.2d 330, 339 (D.C.2001)). In the District of Columbia, the examination of *how* the attorney handled entrusted funds and whether reckless misappropriation occurred entails examination of "a pattern or course of conduct demonstrating an unacceptable disregard for the welfare of entrusted funds, such as (1) the indiscriminate commingling of entrusted and personal funds, (2) the failure to track settlement proceeds, (3) the disregard of the status of accounts into which entrusted funds were placed, or (4) per-

mitting the repeated overdraft condition of an account." 802 A.2d at 348–49. The court also noted that "the indiscriminate movement of monies between accounts" and the "disregard of inquiries concerning the status of funds" were other factors indicating recklessness. 802 A.2d at 349.

The court distinguished Ms. Cafferty's case from another misappropriation case, *In re Anderson*, stating that *Anderson* involved a single act of misconduct and a finding of negligent misappropriation, whereas Ms. Cafferty "engaged in a pattern of course or conduct demonstrating an unacceptable disregard for the welfare of entrusted funds." *Id.* (citation omitted). The court continued:

> This pattern extended over several years, including substantial periods of time in which Mr. Carlson was not paying attention to the affairs of the firm, thus calling into question Ms. Cafferty's insistence that she acted only at the direction of Mr. Carlson, and that the entire blame for the misappropriation falls squarely on him.

802 A.2d at 349. The District of Columbia court observed that in *Anderson*, although there was insufficient evidence to conclude that Anderson engaged in reckless misappropriation and related violations involving a single failure to pay a client's medical bill from settlement funds, the court noted that "[i]f in fact Mr. Anderson ignored or willfully blinded himself to ... reminders [by the client that the bill had not been paid], then we would have no difficulty sustaining the [hearing committee's] determination of recklessness." *Id.* (quoting *Anderson*, 778 A.2d at 341). The court found that precise situation in Ms. Cafferty's case:

> Ms. Cafferty ignored repeated requests by the 17th Street condominium clients for an accounting of client trust funds. She also willfully blinded herself to Mr. Carlson's improper transfer of funds from the Riggs Escrow Account to Carlson & Cafferty's operating accounts, as well as to the consequences of her own improper use of the Riggs Escrow Account by writing checks to "cash" for personal payments. As the Board noted in another reckless misappropriation case, 'this is not a case where all of the conduct resulting in

a misappropriation was caused by someone else.' *In re Gregory,* 790 A.2d 573, 578 n. 1 (D.C.2002). Indeed, the record clearly and convincingly demonstrates Ms. Cafferty's active and reckless involvement in the misappropriation of client trust funds.

802 A.2d at 349.

Ms. Cafferty's culpable behavior was described as follows:

"Ms. Cafferty was a signatory on the firm's accounts, including the Riggs Escrow Account. She was well-attuned to the impropriety of using client funds to pay for personal expenses, and she had left a prior firm because a partner had engaged in the practice. Nonetheless, bank records reveal that at least from late 1991, and continuing through mid–1996, Ms. Cafferty personally wrote numerous checks on the Riggs Escrow Account that were made out to cash, in amounts ranging from $50.00 to $7,615.06. During this period of time, Carlson & Cafferty's operating account at the First Liberty National Bank was overdrawn repeatedly, to such an extent that the bank closed the account in 1995. To create another operating account, Mr. Carlson and Ms. Cafferty transferred thousands of dollars from the Riggs Escrow Account to the Commercial Quest, Inc. account, designed initially for a business venture headed by Ms. Cafferty. The Board specifically found that '[Ms.] Cafferty signed many of the checks that were drawn on the Riggs Escrow Account that transferred these funds' to the Commercial Quest account, despite the fact that she personally deposited some of the funds sent to the law firm by the 17th Street condominium clients into the escrow account and thus knew that the Riggs Escrow Account contained client trust funds. After transferring funds from the escrow account to the Commercial Quest account, Ms. Cafferty wrote checks out to 'cash' on that account in the amount of $3,294.15. By mid–1996, when the condominium clients were seeking disbursement of approximately $40,000.00 in client trust funds, less than $2,000.00 remained in the Riggs Escrow Account.

"Furthermore, Ms. Cafferty acknowledged that she even paid herself with funds from the Riggs Escrow Account, but again sought to shift the blame to Mr. Carlson. As she asserted during her testimony before the hearing committee, in response to a question about her receipt of compensation from the client trust fund: 'When [Mr. Carlson] had his money in there, and I needed to get paid, he would say write it for cash, and he was loaning it to the firm from his money.'

"Ms. Cafferty wrote checks on the Riggs Escrow Account, made out to cash, when she knew about requests from the condominium clients for accountings. She attended meetings of the 17th Street condominium association and became aware that repeated requests had been made for an accounting of the client trust funds. Even though she may not have prepared or seen the reports, she was present at the condominium association meetings when inaccurate and misleading accounting reports were distributed to her clients. She also knew that she and Mr. Carlson were the only lawyers in the firm; that personal funds from Mr. Carlson were being placed in the client trust fund; and that beginning in or around 1994, Mr. Carlson was not paying proper attention to the affairs of the law firm due to personal problems, including protracted problems with his marriage and heavy drinking, leaving substantial responsibility for the affairs of the firm to her. Yet, she took no steps to ensure the 'safety and welfare of entrusted funds.' *In re Anderson*, 778 A.2d at 338. Instead, she personally displayed 'an unacceptable disregard for the security of the client funds,' *id.* (citation omitted) and 'a conscious indifference to the consequences of [her] behavior for the security of these funds[,]' *id.* at 339 (reference omitted). In short, her actions relating to the Riggs Escrow Account were not inadvertent or negligent. Rather, the record contains clear and convincing evidence that she recklessly misappropriated client trust funds. The record also supports the Board's determination that Ms. Cafferty failed to render accountings promptly to her condominium clients upon request. She

attended meetings of the condominium association, including one in February 1994, and many of the written requests for accountings were addressed to her. Hence, Ms. Cafferty was aware of the requests for accountings, but made no effort to see that they were rendered in a timely fashion. For example, despite repeated requests, after the delayed submission of an accounting in June 1995, for an additional accounting, none was forthcoming until two of the condominium clients filed an ethical complaint against Mr. Carlson and Ms. Cafferty. Thus, the record contains clear and convincing evidence that Ms. Cafferty failed to render accountings promptly to her condominium clients upon request."

802 A.2d at 349–51 (internal footnotes omitted).

The District of Columbia Court of Appeals also addressed Ms. Cafferty's contention that the consolidation of her case with Mr. Carlson's case violated her due process rights. The court noted the importance of judicial economy in consolidating the cases because they both arose out of their joint representation of the 17th Street condominium clients, and concluded that the record revealed that no prejudice accrued to Ms. Cafferty. 802 A.2d at 351.[5]

## II.

### A.

Ms. Cafferty argues that this Court should find compelling her enumeration of "undisputed" facts:

---

**5.** The District of Columbia court also found that proper weight and consideration was given by the D.C. Board on Professional Responsibility to the testimony of Ms. Cafferty's witnesses. *In re Carlson*, 802 A.2d at 351. The court further concluded that the D.C. Hearing Committee's failure to submit its report within sixty days after her hearing concluded, as required by D.C. Bar R. XI, § 9(a), was harmless and did not violate her due process rights because the rule is directory, not mandatory, as indicated in another decision rendered by that court, *In re Morrell*, 684 A.2d 361 (D.C.1996).

"It is undisputed that, throughout her entire professional career (since 1985), Respondent Cafferty never managed the accounts of the firm and in particular the trust account, as the Hearing Committee and the Board correctly concluded;

"It is undisputed that Respondent Cafferty never wrote a single check except at the express direction of Carlson;

"It is undisputed that Respondent Cafferty, on a number of occasions during the time period Bar Counsel maintains misappropriations were being made, asked complainants to take possession and control of the funds at issue;

"It is undisputed that the complainants never dealt with Cafferty concerning the sale of the condo; they had nothing to do with her for more than a year prior to the sale;

"It is undisputed that, after the closing(s), the complainants never asked Respondent Cafferty to [disburse] the funds nor did they inform her that Carlson had failed to do so upon request;

"It is undisputed that Carlson prepared all the accountings;

"It is undisputed that Cafferty did not have the data necessary to generate an accounting;

"It is undisputed that throughout the representation, complainants received periodic accountings from Carlson;

"It is undisputed that although Fritz [a condominium association client] wanted accountings more frequently, complainants continued to retain the firm, specifically Mr. Carlson;

"It is undisputed that the primary accounting issue had to do with Mr. Thompson's abject failure to make timely payments in the proper amount; [and]

"It is undisputed that Respondent Cafferty has never been the subject of any disciplinary action, prior to this matter."

Respondent asks us to disregard the findings and conclusions of the District of Columbia Court of Appeals and instead rely on the conclusions drawn by the D.C. Hearing Committee and

the D.C. Board of Professional Responsibility that she had not acted dishonestly as alleged by D.C. Bar Counsel. Ms. Cafferty argues that it was inconsistent for the D.C. Hearing Committee and D.C. Board to each find that she had not acted dishonestly, but nonetheless recommend that she be disbarred from the District of Columbia Bar.

Respondent analogizes her case to that of *Attorney Grievance Comm'n v. Powell*, 328 Md. 276, 614 A.2d 102 (1992), a case involving the alleged misappropriation of funds in which we found that there was a lack of clear and convincing evidence of "dishonesty, fraud, deceit, or misrepresentation." 328 Md. at 292, 614 A.2d at 110. Respondent notes that Mr. Powell was the only attorney responsible for the trust account and that he was aware that there was a probability that his client's funds might be mis-deposited. 328 Md. at 295, 614 A.2d at 112. Powell also had arranged a "loan" from a client and subsequently bounced the repayment check although the funds were ultimately repaid. *Id.* This Court found that the misappropriation had been unintentional and suspended Powell for six months. Respondent notes that we took into account that Powell had been in practice for twenty years with no prior occurrences of misconduct. 328 Md. at 301, 614 A.2d at 115. Respondent contends that, like Powell, she engaged in no prior instances of misconduct in her fifteen years as a member of the D.C. Bar. Respondent points out she fully cooperated with Bar Counsel, unlike Powell, who was found to have been "less than cooperative and reasonable in his responses to Bar Counsel's investigation." 328 Md. at 299, 614 A.2d at 114. Respondent also relies on *Attorney Grievance Comm'n v. Ober*, 350 Md. 616, 714 A.2d 856 (1998), where we took note of Mr. Ober's spotless record when determining his sanction.

She lastly urges us to find that she is not a threat to the public and that disbarring her from the practice of law in the State of Maryland would be a solely punitive action and thus inconsistent with one of our self-avowed purposes in imposing disciplinary sanctions. *See Attorney Grievance Comm'n v. Awuah*, 346 Md. 420, 435, 697 A.2d 446, 454 (1997) (noting that

"[t]he public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed").

## B.

We conclude that Ms. Cafferty's conduct, as found by the District of Columbia Court of Appeals, is more analogous to that found in *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 773 A.2d 463 (2001), and *Attorney Grievance Comm'n v. Gallagher*, 371 Md. 673, 810 A.2d 996 (2002), than to *Powell* or *Ober*. The misconduct in *Powell* involved the disbursement of various settlement funds to a single client. Mr. Powell maintained two bank accounts in connection with his law practice. The first was maintained at Sovran Bank, and the second was maintained at Fund for Government Investors, Inc. ("FGI"). The FGI account was intended as the sole depository of the pertinent settlement funds. 328 Md. at 281, 614 A.2d at 105. Of the nine settlement checks Powell received, he deposited three into the Sovran account and six into the FGI account. *Id.* Powell and his client had numerous telephone conversations and exchanged several letters involving the settlement funds between 23 March 1988 and 17 May 1989. 328 Md. at 283–85, 614 A.2d at 106–07. Arrangements were made to defer Powell's payment of the owed settlement proceeds for Powell's use in the form of a personal loan. 328 Md. at 284, 614 A.2d at 106. Powell ultimately gave his client a promissory note in the amount due to her from the settlement proceeds. 328 Md. at 285, 614 A.2d at 107. Although the principal of the promissory note, together with accrued interest, was due on 2 January 1989, Powell did not send his client anything until a check for interest only on 14 April 1989. That check was returned for insufficient funds. 328 Md. at 285, 614 A.2d at 107. After receiving notice of the dishonored check, Powell told his client, by letter dated 17 May 1989, to redeposit the check, which she did. *Id.* The client filed a complaint with the Attorney Grievance Commission in August of 1989 because she had not heard from Powell again since the 17 May 1989 letter.

We found that Powell unintentionally misappropriated $52,000 of his client's funds by depositing them into the Sovran account. After discovering this mis-deposit, Powell calculated what was due him in fees and expenses and determined that transferring the money into the FGI account and then back into the Sovran account would be pointless. 328 Md. at 300, 614 A.2d at 114–15. We concluded that although Powell's conduct came perilously close to gross negligence, the unintentional misappropriation was not grossly negligent. *Id.* In meting out the appropriate sanction, we reasoned as follows:

> We are aware that Powell has been in private practice for over twenty years and that this is the first time he has been charged with professional misconduct. We also are aware that the funds in this case are those of a single client. The record also is replete with the many personal and familial problems confronting Powell during this period of time. Yet, despite the many problems that confronted Powell, the trial court found that Powell was a more than capable attorney during this period.

> After careful consideration of this matter, we have determined that a substantial suspension is called for. Accordingly, Robert Dominick Powell will be suspended indefinitely from the practice of law with the right to reapply not less than six months from the date of the filing of this opinion.

328 Md. at 302, 614 A.2d at 115.

Unlike Powell, who committed a single infraction, Respondent was found by the District of Columbia court to have engaged in a pattern of misappropriation. She ignored repeated requests by the 17th Street condominium clients for an accounting of client trust funds and willfully blinded herself to Mr. Carlson's improper transfer of funds from the Riggs Escrow Account to Carlson & Cafferty's operating accounts, as well as to the consequences of her own improper use of the Riggs Escrow Account by writing checks to "cash" for personal payments. In comparison, Powell kept in contact with his client and regularly responded to the client's requests for accountings, although his responses were not always satisfac-

tory. Moreover, the District of Columbia court also found that the record indicated Respondent's active and intentional involvement in misappropriating client trust funds. Respondent's reliance on *Ober* is likewise misplaced because Mr. Ober was found to have engaged in unintentional misappropriation, unlike Ms. Cafferty.

In *Vanderlinde*, 364 Md. at 414, 418, 773 A.2d at 485, 488, Ms. Vanderlinde was charged with violating Rule 8.4 as a result of embezzling funds from her employer over a period of time. We stated in *Vanderlinde* that disbarment ordinarily should be the sanction "in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct." 364 Md. at 414, 773 A.2d at 485. We observed,

> Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials, or other factors. Unlike matters relating to competency, diligence, and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.

> Disbarment ordinarily should be the sanction for intentional dishonest conduct. . . .

364 Md. at 418, 773 A.2d at 488.

We disbarred an attorney in *Attorney Grievance Comm'n v. Gallagher*, 371 Md. 673, 810 A.2d 996 (2002), for unmitigated and intentional misappropriation of client funds. Mr. Gallagher established an escrow account for his client and then proceeded to "intentionally and consistently" deplete the funds of that account without the permission of his client. 371 Md. at 706, 810 A.2d at 1016. Even after the client demanded the return of the money, Gallagher continued to deplete the account. When Gallagher did return the entire amount due his client from the proceeds received in another transaction,

he failed to keep that money in trust after it was deposited in the account and before it was disbursed to his client. 371 Md. at 706–07, 810 A.2d at 1016. We disbarred Gallagher after noting our "consistent practice of disbarment of lawyers who misappropriate client funds absent mitigation or extenuating circumstances." 371 Md. at 715, 810 A.2d at 1021.

We found that Mr. DiCicco in *Attorney Grievance Comm'n v. DiCicco*, 369 Md. 662, 686, 802 A.2d 1014, 1027 (2002), commingled funds and misused trust money in violation of MRPC 1.15(a) & (c), MRPC 8.4(a) [6], and Md. Rules 16–607(a) [7] and 16–609. We imposed a ninety-day suspension. The hearing judge found that DiCicco failed to deliver funds owed to his client's medical provider until two years after the settle-

---

**6.** Maryland Rule 8.4(a) provides that it is professional misconduct for a lawyer to:

>    (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.

**7.** Rule 16–607 (Commingling of funds) provides in relevant part:

>    (a) General Prohibition. An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

>    (b) Exceptions. 1. An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 16–610 b 1(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.

>    2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

>    3. Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

ment of a negligence claim, although he did so on the instruction of his client. 369 Md. at 674, 802 A.2d at 1020–21. Throughout the course of DiCicco's representation of his client, DiCicco did not keep the disputed funds separate from his own personal funds and on numerous occasions the balance of the escrow account fell below the $3,500 DiCicco ultimately paid the medical provider. *Id.* Thus, DiCicco violated Rules 1.15(a) & (c) by failing to hold property of clients or third persons separate from his own. We agreed with the hearing judge's assessment that DiCicco "used [the escrow account] as if it also served as his personal bank account." 369 Md. at 676, 802 A.2d at 1022. In deciding on an appropriate sanction, we noted that although misappropriation usually mandates disbarment, "[w]here there is no finding of intentional misappropriation, however, and where the misconduct did not result in financial loss to any of the respondent's clients, an indefinite suspension ordinarily is the appropriate sanction." 369 Md. at 687, 802 A.2d at 1028. We imposed suspension rather than disbarment based on the respondent's absence of fraudulent intent, lack of evidence that any client suffered financial loss, and the lack of evidence of any prior disciplinary problems in respondent's thirty-eight year membership at the Maryland Bar. 369 Md. at 688, 802 A.2d at 1028.

We noted the importance of the hearing judge's conclusions of fact regarding allegations of attorney misappropriation in *Attorney Grievance Comm'n v. Santos,* 370 Md. 77, 87, 803 A.2d 505, 511 (2002). In the *Santos* case, the attorney was found, in addition to other offenses, to have engaged regularly in the practice of depositing all funds received from his clients, including unearned fees and expenses, into his operating account, in violation of MRPC 1.15 and Md. Rule 16–604. 370 Md. at 83, 803 A.2d at 508. Santos failed to return unearned fees to his clients. *Id.* We noted that disbarment was the preferred sanction in cases involving misappropriation, but declined to impose that sanction because the hearing judge did not find Santos' behavior to be "dishonest or fraudulent or done with intent to defraud," referring instead to the conduct as "neglect." 370 Md. at 87–88, 803 A.2d at 511. Based on

the finding by the hearing judge of misappropriation through neglect, we indefinitely suspended Santos with the right to apply for readmission no sooner than ninety days.

In *Attorney Grievance Comm'n v. Seiden,* 373 Md. 409, 818 A.2d 1108 (2003), the hearing judge found that Mr. Seiden, in his representation of one client, Ms. Mentlik, engaged in various acts of misappropriation of that client's funds. Seiden was hired by Mentlik to represent the estate for which she was the Personal Representative, and Seiden attended the settlement of some real property that was part of the decedent's estate. 373 Md. at 413, 818 A.2d at 1110. A check was tendered and made payable to Mentlik that Seiden then deposited into his account by signing Mentlik's name to the check. *Id.* The hearing judge did not find that Seiden had signed his client's name without her authority. *Id.* Seiden then wrote Ms. Mentlik a check from his own escrow account for the amount of the settlement, minus a sum representing his legal fee, but without submitting a fee petition to the Orphan's Court and without Mentlik's written consent to that fee. *Id.* We observed that the relationship between Seiden and Mentlik was troubled to such a degree that, although he never hid his actions from Mentlik, Seiden "was presented with an extremely difficult situation, in which he likely knew that it would be nearly impossible to procure his fee," and so "took the 'easy' shortcut to obtaining his fee." 373 Md. at 420, 818 A.2d at 1114. We noted that this type of conduct was not theft or "the type of dishonest conduct for which we consistently issue severe sanctions." *Id.* We concluded that his misappropriation of client funds was not intentional and, therefore, imposed an indefinite suspension with the right to apply for readmission no sooner than thirty days. 373 Md. at 423, 425, 818 A.2d at 1117.

## C.

As noted above, Respondent asks us to disregard the factual findings and legal conclusions of the District of Columbia Court of Appeals and instead rely on the findings of the D.C. Hearing Committee and the D.C. Board of Professional Re-

sponsibility. Maryland Rule 16–773(g), as noted above, addresses the conclusive effect of a prior final adjudication in a reciprocal disciplinary matters: "[a] *final* adjudication in a disciplinary or remedial proceeding by another court, agency, or tribunal that an attorney has been guilty of professional misconduct or is incapacitated is conclusive evidence of that misconduct or incapacity. . . ." Md. Rule 16–773(g) (emphasis added). Therefore, we accept the final adjudication of the District of Columbia Court of Appeals as conclusive. There is no basis for us to consider the findings or conclusions of the intermediate D.C. Board on Professional Responsibility or the D.C. Hearing Committee. Only the final factual findings and legal conclusions of the District of Columbia Court of Appeals are relevant to our inquiry under Md. Rule 16–773(g).

Maryland does not recognize the three-tiered categorization of misappropriation misconduct employed by the District of Columbia. Instead, as *Vanderlinde* elucidates, disbarment is presumed to be the appropriate sanction for any intentional dishonest misconduct, including the intentional misappropriation of client funds. Taken as a whole, the Maryland cases discussed above provide us with an analytical framework we shall employ to classify Respondent's behavior for purposes of reciprocal discipline. We decline to compare the District of Columbia's three categories of misappropriation to the two categories in our analytical framework for misappropriation cases; instead, we shall apply our analytical framework to the factual findings of the District of Columbia court.

Our caselaw distinguishes between the intentional misappropriation of client funds and the misappropriation of client funds resulting from negligent or otherwise unintentional behavior. When there has been a finding of intentional misappropriation we have recognized as mitigating factors only "the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the 'root cause' of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC." *Vanderlinde*, 364 Md. at 413–14, 773 A.2d at 485. *See Attorney Griev. Comm'n v. Duvall*, 373 Md.

482, 819 A.2d 343 (2003) (finding that indefinite suspension was the appropriate sanction where the attorney's acts of misappropriation were the direct result of severe depression); *Attorney Griev. Comm'n v. Garfield,* 369 Md. 85, 797 A.2d 757 (2002) (imposing indefinite suspension when attorney's professional misconduct was a direct result of his cocaine addiction). In cases where the attorney engaging in the acts of misappropriation did so without the clear intent to defraud his clients, we have imposed indefinite suspension as the appropriate sanction. *Attorney Griev. Comm'n v. Culver,* 371 Md. 265, 808 A.2d 1251 (2002); *Attorney Griev. Comm'n v. Hayes,* 367 Md. 504, 789 A.2d 119 (2002).

Under the three categories of misappropriation recognized by the District of Columbia Court of Appeals, disbarment is the presumptive sanction for both reckless and intentional misappropriation, whereas a lesser sanction may be appropriate for acts of negligent misappropriation. *In re Carlson,* 802 A.2d at 348. The District of Columbia court described reckless misappropriation as encompassing acts of "conscious indifference" towards the use and management of client funds. 802 A.2d at 348. Although Maryland does not recognize three distinct and separate categories of misappropriation, we do distinguish between negligent and intentional misappropriation.

Respondent's "conscious indifference" in the use and management of the client trust account constitutes intentional misappropriation under Maryland law. Respondent's acts of misappropriation fall into what our cases have determined to be "intentional" behavior sanctionable by disbarment.

The District of Columbia Court of Appeals found Respondent was "well-attuned to the impropriety of using client funds to pay for personal expenses," and concluded that the record revealed that her actions regarding the Riggs Escrow Account were "not inadvertent or negligent," and instead demonstrated her "active and reckless involvement in the misappropriation of client trust funds." 802 A.2d at 349–50. The court construed the record as indicating that Ms. Cafferty knew that

her behavior was wrong because of her association with a prior firm where one of the partners was engaging in such activity, and yet, she engaged in misappropriation activities including, at times, paying herself a salary out of the client trust account. 802 A.2d at 350. "Ms. Cafferty wrote checks on the Riggs Escrow Account, made out to cash, when she knew about requests from the condominium clients for accountings." *Id.*

In *Gallagher*, the attorney was disbarred for his unmitigated and intentional misappropriation of client funds. 371 Md. at 706, 810 A.2d at 996. We found that

> [W]hen respondent established the Escrow Account for Mr. Lobo, he intentionally and consistently depleted the funds of said account without the permission of Mr. Lobo. Nearly every disbursal was directly to respondent himself, with the exception of the funds wired to Anglo American in England. Even after Mr. Lobo demanded the return of the $30,000, evidencing his lack of knowledge of respondent's account activity, respondent continued to disburse funds to himself."

*Id.* Likewise, Ms. Cafferty intentionally and consistently depleted the funds in the Riggs Escrow Account without the permission of the condominium owners. The missing funds were used by Respondent, without her clients' knowledge or consent, to pay herself and other payees unrelated to the condominium association or its business, at times when the balance in the Riggs Escrow Account had fallen below the amount required to be held in trust. 802 A.2d at 345. The District of Columbia Court of Appeals agreed with the D.C. Board's finding that "when Carlson & Cafferty were required to disburse to the condominium owners the more than $ 40,000 that they had received to hold in trust, only approximately $ 2,000 of the funds remained in the Riggs Escrow Account." *Id.*

Respondent commingled the Riggs Escrow Account funds with other accounts and used the escrow funds for purposes not associated with her condominium client's interests. *Id.* The District of Columbia Court of Appeals's conclusions, un-

der our own caselaw, provide conclusive evidence that Respondent intentionally misappropriated client funds in violation of MRPC 1.15(a), (b), and (c) and 8.4(c) and (d), as well as Rule 16–609.

### III.

Bar Counsel recommends that Respondent be disbarred from the practice of law in Maryland as she also was in the District of Columbia. Respondent argues that the circumstances do not support a sanction of disbarment.

We tend to, *see Attorney Griev. Comm'n v. Sabghir,* 350 Md. 67, 83, 710 A.2d 926, 934 (1998); *Attorney Griev. Comm'n v. Richardson,* 350 Md. 354, 365–66, 712 A.2d 525, 530–31 (1998), but are not required to, *see Attorney Griev. Comm'n v. Gittens,* 346 Md. 316, 324, 697 A.2d 83, 87 (1997), impose the same sanction as that imposed by the jurisdiction in which the misconduct occurred. The Court is duty-bound to assess for itself the propriety of the sanction imposed by the other jurisdiction as well as the sanction recommended by the Commission, 346 Md. at 326, 697 A.2d at 88. We look not only to the sanction imposed by the other jurisdiction, but to the particular facts and circumstances of each case with a view toward consistent dispositions for similar misconduct. *Attorney Griev. Comm'n v. Roberson,* 373 Md. 328, 355–56, 818 A.2d 1059, 1076 (2003). When the purpose in disciplining counsel is the same in both jurisdictions, we ordinarily defer to the other jurisdiction. 373 Md. at 356, 818 A.2d at 1076.

The District of Columbia, like Maryland, views the protection of the public as one of the purposes of attorney discipline. The District of Columbia Court of Appeals, in discussing the impact on the public when an attorney steals client money, noted that the court's treatment of such offenses affects public confidence much more than the offense itself. *See In re Addams,* 579 A.2d 190, 194 (D.C.1990). "Arguments for lenient discipline overlook this effect as well as the overriding importance of maintaining that confidence." *Id.* (citation omitted). We reiterate for our part that the purpose of sanctions

includes the preservation of public confidence in the legal profession and the need to make clear to the bar that the invasion of and misappropriation of client funds will not be tolerated. As a result, we conclude that the disciplinary sanction imposed in the District of Columbia in the present case is appropriate also in Maryland.

We stated in *Hayes* that the general rule is "disbarment will inevitably follow any unmitigated misappropriation of client, or any third party's funds." 367 Md. at 512–13, 789 A.2d at 124. *See, e.g., Attorney Griev. Comm'n v. Vlahos,* 369 Md. 183, 186, 798 A.2d 555, 556 (2002) ("It has long been the rule in this State that absent compelling extenuating circumstances, misappropriation by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment"). We reasoned that "[c]learly, one who acts with deliberation and calculation, fully cognizant of the situation and, therefore, fully intending the result that is achieved is more culpable than one who, though doing the same act, does so unintentionally, negligently or without full appreciation of the consequences." *Hayes,* 367 Md. at 516–17, 789 A.2d at 127.

In this matter, we do not find any circumstances mitigating Respondent's violations, nor do we find any exceptional circumstances as contemplated by Rule 16–773(e). Respondent, although without disciplinary blemish in the District of Columbia or Maryland prior to these proceedings, has been found to have participated in active and reckless involvement in the misappropriation of client trust funds. Additionally, the gravity of Respondent's conduct is compounded by other rule violations: failing to render prompt accountings to her condominium clients, and withdrawing funds from the escrow account payable to cash. In similar situations, we have disbarred other attorneys who have committed such misconduct. *See,* e.g., *Attorney Griev. Comm'n v. Bernstein,* 363 Md. 208, 768 A.2d 607 (2001) (disbarring attorney for willfully misappropriating funds from his client trust account and commingling his personal funds with those of his clients); *Vanderlinde,* 364 Md. 376, 773 A.2d 463 (2001) (disbarring attorney for intentional misappropriation of the funds of another); *Galla-*

*gher*, 371 Md. 673, 810 A.2d 996 (2002) (attorney disbarred for numerous violations when this Court followed its consistent practice of disbarment of lawyers who misappropriate client funds absent mitigation or extenuating circumstances). We conclude that the appropriate sanction in this case is that imposed by the District of Columbia Court of Appeals, namely, disbarment.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRAN-SCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FA-VOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST DIANE E. CAFFERTY.